## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

6:09cv 1963-ORL
28 gJK

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **CASE NO.** |
| **BIG APPLE CONSULTING USA, INC., MJMM INVESTMENTS, LLC, MARC JABLON, MATTHEW MAGUIRE, MARK C. KALEY, and KEITH JABLON,** | |
| **Defendants.** | |

FILED
09 NOV 18 PM 3:00

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## BACKGROUND AND SUMMARY

1.       This case has its roots in a fraud perpetrated by CyberKey Solutions, Inc. ("CyberKey"), a St. George, Utah company that once sold flash memory drives and other electronic devices, and its former chief executive officer, James E. Plant ("Plant"). Starting in November 2005 and continuing through March 19, 2007, CyberKey and Plant engaged in (1) an elaborate scheme to publicize a fictitious $25 million purchase order from the U.S. Department of Homeland Security ("DHS") to attract interest in CyberKey, and (2) an ongoing unregistered public offering of the company's shares. In connection with this scheme, Plant was sued by the Commission and indicted in the U.S. District

Court for the Eastern District of Pennsylvania on charges of securities fraud and obstruction of justice, among other things. The court sentenced Plant to 97 months imprisonment in March 2009.

2.       During the course of its fraud, CyberKey issued hundreds of millions of unregistered shares to Big Apple Consulting USA, Inc. ("Big Apple") through Big Apple's wholly owned subsidiary, MJMM Investments, LLC ("MJMM"). As part of a consulting agreement, CyberKey agreed to provide CyberKey shares to MJMM each month in exchange for Big Apple's agreement to promote CyberKey to prospective investors. The agreement also provided MJMM with the opportunity to acquire an unlimited number of unregistered CyberKey shares directly from the company at a 50 percent discount to the then-current market price. In total, MJMM and Big Apple acquired over 700 million unregistered CyberKey shares, which it sold into the public market for a total of at least $9.6 million. MJMM and Big Apple kept over $7.5 million of the proceeds from the sale of CyberKey stock and transferred at least $2 million of this amount back to CyberKey.

3.       Big Apple provided CyberKey what it characterized as an "all-inclusive campaign" that included financing for CyberKey and services related to business development, sales development, business consulting, web site design, and investor relations. Specifically, Big Apple staff conceived, drafted, edited, and timed press releases designed to promote CyberKey's business. Big Apple President Marc Jablon ("M. Jablon"), MJMM President Mark Kaley ("Kaley") and Keith Jablon ("K. Jablon"), a vice president of another Big Apple subsidiary, supervised much of this work.

4.       To promote CyberKey to investors, Big Apple used a telephone calling

room employing 14-50 callers to interest registered brokers in purchasing the company's unregistered shares by repeating CyberKey's misrepresentations about DHS. Big Apple's president, Marc Jablon ("M. Jablon"), and its vice president, Matthew Maguire ("Maguire"), were instrumental in supervising Big Apple's operations, including the phone room used to call registered brokers on CyberKey's behalf.

5.      Not later than August 8, 2006, Maguire, Kaley, M. Jablon and K. Jablon knew, or were severely reckless in not knowing, that CyberKey did not have a $25 million purchase order from the DHS or any other Federal government agency, and thus had very little legitimate revenue at all. Despite possessing this knowledge, all four executives persisted in promoting CyberKey and selling hundreds of millions of unregistered CyberKey shares to unsuspecting investors.

6.      In distributing these CyberKey shares to the public market, Big Apple and MJMM acted as brokers by participating in securities transactions at key points in the chain of distribution. Big Apple and MJMM also acted as dealers in CyberKey shares by, among other things, participating in an underwriting with respect to those shares although neither Big Apple nor MJMM were ever registered with the Commission as brokers or dealers.

7.      M. Jablon, Maguire, and Kaley provided knowing and substantial assistance to Big Apple and MJMM as the two entities functioned as brokers and dealers without registration with the SEC.

8.      By virtue of their conduct, Big Apple, MJMM, M. Jablon, and Maguire have engaged in violations of Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], and Section 10(b) of the

Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

9. By virtue of their conduct, Kaley and K. Jablon have engaged in violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

10. By virtue of their conduct, Big Apple and MJMM have engaged in violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

11. By virtue of their conduct, M. Jablon, Maguire, and Kaley have aided and abetted Big Apple's and MJMM's violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

12. Unless enjoined, Big Apple, MJMM, Maguire, Kaley, M. Jablon and K. Jablon are likely to commit such violations in the future. They should be enjoined from doing so, ordered to disgorge any ill-gotten gains or benefits derived as a result of their violations and prejudgment interest thereon, and ordered to pay appropriate civil money penalties.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa]. In connection with the acts, practices, and courses of business alleged herein, Defendants, directly or indirectly, made use of the means and instruments of transportation and communication in interstate commerce, and of the mails.

14.     Big Apple's and MJMM's headquarters are in the Middle District of

Florida and certain of the transactions, acts, practices or courses of business alleged

herein took place in the Middle District of Florida.  Venue is therefore proper in this

district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section

27 of the Exchange Act [15 U.S.C. § 78aa].

## DEFENDANTS

15.     Defendant Big Apple Consulting USA, Inc., is a Delaware corporation

headquartered in Longwood, Florida.  The company, which is closely held, claims to be

"the number one public relations and consulting firm in the country for small cap

companies."

16.     Defendant MJMM Investments, LLC is a Pennsylvania limited liability

company headquartered in Longwood, Florida.  MJMM is a wholly owned subsidiary of

Big Apple Consulting.

17.     Defendant Marc Jablon is Big Apple's president and co-founder.  Marc

Jablon founded Big Apple in 1998 with Matthew Maguire and Keith Jablon, Marc's

brother.  Marc Jablon oversees the operations of Big Apple and all of its subsidiaries.

18.     Defendant Matthew Maguire is Big Apple's vice president.  Throughout

the period relevant to this Complaint, Maguire oversaw Big Apple's telephone calling

room floor and its callers' misrepresentations to the registered brokers.  Maguire also

oversaw the sales of CyberKey shares in the face of those misrepresentations.

19.     Defendant Mark Kaley is MJMM's president and Big Apple's corporate

secretary.  Kaley is a lawyer, and during the events relevant to this complaint, Kaley was

Big Apple's corporate counsel.  Kaley is closely involved with all of Big Apple's daily

operations.

20.     Defendant Keith Jablon is vice president of Management Solutions International, Inc., a Big Apple subsidiary and Big Apple's main contact with CyberKey throughout the events relevant to this Complaint.

## RELATED ENTITIES AND PEOPLE

21.     During the events relevant to this complaint, CyberKey Solutions, Inc. was a St. George, Utah-based company that sold flash memory drives and other electronic devices.  CyberKey's common stock never traded on a national exchange, but instead was quoted on the "Pink Sheets" electronic quotation system under the symbol "CYKC" and later "CKYS".  The Commission sued CyberKey for violating the antifraud and registration provisions of the federal securities laws in 2007.

22.     James E. Plant served as CyberKey's chief executive officer ("CEO") from 2001 until his conviction in March 2009.  The U.S. District Court for the Eastern District of Pennsylvania sentenced Plant to 97 months in prison on charges of securities fraud and obstruction of justice arising from his conduct as CyberKey's CEO.

## FACTUAL ALLEGATIONS

### A.     Big Apple's Business Relationship with CyberKey

23.     In June 2005, Big Apple and CyberKey entered into an agreement that proved to be immensely profitable for both sides.  Under this agreement, Big Apple provided CyberKey with a wide array of business consulting and investor relations services.  Big Apple executives had regular meetings with Plant, attended trade shows with him, assisted in researching trademarks, coordinated advertising campaigns, helped design CyberKey's website, assisted Plant in developing CyberKey's business plan, and helped provide financing for CyberKey.

24.     Specifically, K. Jablon, M. Jablon, and Kaley met frequently with Plant

to plan business strategy for CyberKey and to stay updated on CyberKey's financial situation. K. Jablon, Kaley and Maguire attended trade shows with Plant. K. Jablon and Maguire assisted Plant in developing CyberKey's business plan. Big Apple's Staff, under K. Jablon's direction, researched trademarks and helped design CyberKey's website. Kaley and Maguire negotiated and approved the consulting agreement that provided financing for CyberKey. M. Jablon oversaw all of this activity and received regular reports about CyberKey's progress. M. Jablon has stated, "[W]ithout all the work that we were doing for CyberKey Corporation, there would have been no CyberKey Corporation."

25.     CyberKey also enlisted Big Apple's telephone calling room that employed 14-50 callers to interest registered brokers in purchasing CyberKey securities. That calling room was supervised by Maguire and, ultimately, M. Jablon. Other Big Apple staff, including K. Jablon, Kaley, and M. Jablon, conceived, drafted, edited, and planned the timing of press releases designed to promote CyberKey's business. Those press releases presented Big Apple as the main contact for those interested in learning more about CyberKey. When potentially-interested investors called in response to those press releases, Big Apple staff, including K. Jablon and others working under his direction, gave those investors' names and contact information to Maguire and others working under him. Maguire and his staff then forwarded the investors' names and contact information to the brokers who were interested in trading CyberKey stock.

26.     In return for this work, CyberKey paid Big Apple through MJMM. MJMM's original agreement called for CyberKey to transfer to MJMM either cash or unregistered shares of CyberKey stock equal to $50,000 per month for these services.

CyberKey rarely, if ever, paid MJMM in cash. Therefore, shortly after the monthly transfers of stock from CyberKey, MJMM sold the shares on the open market to convert them into money. In October 2006, the agreement between CyberKey and Big Apple was renewed and MJMM began receiving monthly transfers of unregistered shares that had a cash equivalent of $80,000.

27.     The original agreement between CyberKey and Big Apple also gave MJMM the option to buy shares of CyberKey stock that had a cash equivalent of $100,000 at three different strike prices: $.05, $.15, and $.20. However, soon after it was entered, Big Apple renegotiated this term of the agreement when it realized that call options with a strike price of $.05 or more were likely worthless given CyberKey's low share price, which typically hovered between $.01 and $.04 per share. Under the renegotiated agreement, the options approach was abandoned, and MJMM was simply given the right to acquire an unlimited number of unregistered shares directly from CyberKey at a 50 percent discount to the average closing bid price for CyberKey stock during the previous 10 trading days. Plant readily agreed to these new terms because CyberKey needed the cash from Big Apple just to sustain daily operations.

28.     Between June 2005 and March 2007, MJMM received hundreds of millions of shares of CyberKey stock through the original and renegotiated agreements with CyberKey. MJMM used the discount provision of the agreements to acquire over 300 million unregistered CyberKey shares. MJMM and Big Apple then sold these shares into the market for a total of at least $9.6 million. MJMM and Big Apple kept about $7.5 million of the proceeds from the sales and transferred the remainder, at least $2 million, to CyberKey. This transfer had the effect of financing CyberKey's operations. Maguire

- 8 -

and M. Jablon directed all of MJMM's and Big Apple's sales of CyberKey shares.

29.     MJMM was by far the largest seller of CyberKey stock during the period relevant to this Complaint.  CyberKey never had a registration statement in effect for any offering of its shares.

### B.     The Origin of CyberKey's Fraud

30.     On December 8, 2005, CyberKey issued a press release falsely announcing that "the Company [had] received a multi-million Dollar purchase order from the Department of Homeland Security.  The initial purchase order is in excess of 150,000 units."  Big Apple staff, including K. Jablon, wrote a first draft of this press release, and Big Apple was listed as the primary contact for investors at the bottom of the press release.  Between December 8, 2005, and August 8, 2006, Big Apple staff participated in the drafting and editing of 21 press releases referring to this fictitious purchase order. At the same time the press releases were being disseminated, Big Apple used its telephone calling room services to repeat CyberKey's misrepresentations about DHS and promote CyberKey to brokers.  M. Jablon directed and supervised Big Apple's activity with respect to these press releases for CyberKey.  M. Jablon and Maguire directed and supervised Big Apple's activity with respect to the telephone room calling services for CyberKey.

### C.     Defendants' Exposure to Troubling Red Flags about Plant and CyberKey

31.     As the relationship between Big Apple and CyberKey developed, the individual Defendants became aware of numerous red flags suggesting that Plant was not a trustworthy person and that CyberKey had very little legitimate revenue.

32.     Even before Plant had made any claims about DHS, he claimed in an email to K. Jablon, M. Jablon, and Maguire, that CyberKey had contracts with Kodak, EMI Capitol Records, and a company called Time Mulenhoff. But none of the Big Apple executives knew if those contracts actually existed. Plant continually deflected questions from K. Jablon about the specifics of the supposed contracts with these companies.

33.     Soon after Big Apple and CyberKey entered their original consulting agreement, Plant agreed to a one-sided renegotiation, without any additional consideration, pursuant to which Big Apple was permitted to acquire an unlimited number of shares directly from CyberKey at a 50 percent discount to the average closing bid price for CyberKey stock during the previous 10 trading days. Kaley and Maguire renegotiated this provision for Big Apple, and M. Jablon supervised this renegotiation.

34.     In February 2006, K. Jablon and Kaley traveled from Orlando to San Diego to accompany Plant on a number of sales meetings Plant had purportedly scheduled to pitch CyberKey's products to major corporations including Toshiba. Despite their traveling across the country for this express purpose, no meetings ever took place. Every meeting Plant claimed he had arranged was supposedly cancelled at the last minute when Plant reported to Kaley and K. Jablon that he had just received a disappointing call on his cell phone. K. Jablon informed M. Jablon about these lapses on or about July 13, 2006.

35.     Approximately one month later, M. Jablon and K. Jablon traveled to Hawaii to attend meetings Plant had supposedly set up with high-ranking military personnel. But, when they arrived in Hawaii, except for one meeting that resulted in no business for CyberKey, Plant told the Jablons that their attendance was not necessary.

- 10 -

36.     By late April 2006, Big Apple had arranged for CyberKey to become a strategic partner of another Big Apple client company.  Under this arrangement, CyberKey had agreed to send this company $80,000 as payment for its products.  Despite Plant's repeated promises, though, the money was never forthcoming.  On Friday, April 28, M. Jablon sent Plant a scathing email, copying K. Jablon and Kaley, and noting that "[f]or the last ten days you have been making daily promises . . . that you were either bringing a check to fulfill the purchase order or sending a wire . . . .  Your repeated promises . . . [are] not only an embarrassment to our company who has been representing you as a model client, but is also an embarrassment to CyberKey."  Plant responded thirteen minutes later, "Bottom Line He will get his money . . .by Monday. . . .You will have a fax by Friday late as to the confirmation."  Plant did not send the money, and M. Jablon was forced to write to Plant after the weekend to say, "You never called . . . on Fiday [sic], and you didn't send the wire.  [The other company's CEO] Frank just informed me that he is sending over a letter in the morning terminating your relationship."

37.     Throughout the period relevant to this Complaint, Plant's credibility was a constant issue.  Plant typically furnished a variety of medical excuses to avoid accountability for his delays—including lymphoma, testicular cancer, and an employee's anorexia.  However, Plant never exhibited signs of cancer treatment to the individual Defendants.

38.     Despite publicly claiming receipt of a $4.2 million payment in connection with the reported $25 million DHS agreement on April 4, 2006, at no point did Plant attempt to renegotiate the one-sided "options" deal with Big Apple.  Instead,

CyberKey continued to sell its stock to Big Apple for half the stock's market price.

39.     In May or June of 2006, CyberKey's outside counsel, J. Bennett Grocock,

informed Big Apple executives, including Kaley, that CyberKey had not been paying his

legal bills. Plant's explanation for not paying Grocock was that he needed to devote all

his resources to the DHS contract. From that point on, even though CyberKey had

recently claimed receipt of a $4.2 million payment from DHS, Big Apple paid at least

$50,000 of CyberKey's legal fees by "exercising options" and sending checks to Grocock

instead of CyberKey.

40.     In June 2006, at Plant's direction, Big Apple rushed to issue a press

release announcing that CyberKey's products were available on a website run by the

Military Family Network. After the press release was issued, a representative from that

network called Big Apple to explain that Plant had never received permission to issue the

release and that CyberKey's products were not, in fact, available on that website. The

substance of the Military Family Network's complaint was conveyed initially to K.

Jablon, who later informed Kaley and M. Jablon on or about July 13, 2006.

41.     In mid-July 2006, Plant told K. Jablon that CyberKey was about to be

listed on websites sponsored by the General Services Administration indicating that

CyberKey's products were approved for sale to the United States government. Plant said

for at least two weeks that he was just about to forward links to these websites to Big

Apple staff. Big Apple never received these links from Plant or otherwise saw evidence

of the websites that Plant claimed. K. Jablon informed Kaley and M. Jablon about this

lapse on or about July 13, 2006.

42.     None of the individual Defendants saw CyberKey's core products function as Plant claimed they could.

### D. Big Apple Learns That DHS Has No Record of a Purchase Order with CyberKey

43.     On August 3, 2006, the Financial Industry Regulatory Authority ("FINRA") (formerly the National Association of Securities Dealers) sent a request letter to Plant directing him to produce, among other things, any contracts between CyberKey and DHS; contact information for CyberKey's contacts at DHS; and any contracts between CyberKey and Big Apple.  Defendants M. Jablon and Kaley became aware of the request letter shortly after Plant received it.

44.     Five days later, on August 8, 2006, a DHS official sent an inquiry to Big Apple about CyberKey's claimed relationship with DHS.  The inquiry stated: "[W]e have been unable to locate this order.  Please provide the purchase order number and/or name and address of the dealer (if applicable), which sold the products to DHS."  All the individual Defendants became aware of this inquiry shortly after its receipt at Big Apple on August 8, 2006.

45.     Despite learning directly from DHS that the agency was unable to locate any record of a purchase order issued to CyberKey, neither the individual Defendants nor anyone else at Big Apple responded to DHS's request for information.  Rather, Big Apple executives, including K. Jablon, M. Jablon and Kaley, simply turned the matter over to Plant and assumed he would take care of it.  After receiving the inquiry from DHS, Big Apple continued to promote CyberKey highlighting CyberKey's claim that it had received a purchase order from DHS or some other unspecified Federal government agencies.

- 13 -

46.     Specifically, after August 8, 2006, Big Apple staff drafted and/or edited 36 separate CyberKey press releases that highlighted the company's fictitious relationship with DHS. Some of the releases included new false information about DHS, while many repeated boilerplate language about the DHS purchase order, providing a near-constant reminder to the market that $25 million from the federal government formed the core of CyberKey's revenue stream. None of the press releases noted that Big Apple was being paid to promote CyberKey stock. Defendants Kaley, M. Jablon, and K. Jablon supervised Big Apple's work in drafting and editing these press releases. A table summarizing the relevant sections of these press releases follows:

| Date | Content |
|------|---------|
| 8/9/06 | "CyberKey . . . recently announced that the Department of Homeland Security added 40,000 units of CyberKey's new biometric USB drive to their original $25 million purchase order. . . . CyberKey . . . is currently shipping their USB flash drives to the Department of Homeland Security." |
| 8/11/06 | "CyberKey . . . recently announced that the Company has reported total Net Income of $12,152,060 for the first and second quarters of 2006. . . . CyberKey . . . recently received a $25 Million Dollar purchase order from the Department of Homeland Security." |
| 8/25/06 | "Wallstreetcorner.com states, 'CyberKey . . . has already received a number of approvals . . . from various different governmental agencies, where the Company is currently fulfilling a $25,000,000 purchase order.' " |
| 9/6/06 | "CyberKey . . . is currently fulfilling a $25 Million purchase order to various segments of the U.S. Government." |
| 9/19/06 | "CyberKey . . . has achieved several significant milestones in the development of the Company. The most significant event to take place in . . . five years has been that CyberKey . . . has received a purchase order from the federal government in excess of $25,000,000 US dollars . . . ." |
| 10/4/06 | "The Asia-Pacific Homeland Security Summit and Expo will be an amazing opportunity for us . . . . Because the existing orders we have with various U.S. government agencies established credibility for us, we believe that this will be a very beneficial event for CyberKey." |
| 10/25/06 | "CyberKey . . . is pleased to announce that the Company has received a second payment of $4.2 Million from various government agencies for an additional shipment of 30,000 CyberKey units. The total order submitted by the federal government is for 150,000 units and is expected to exceed $25 Million." |
| 10/27/06 | "CyberKey . . . is currently fulfilling a $25 Million purchase order to |

|  | various segments of the U.S. Government." |
|---|---|
| 1/3/07 | "Over the past year, CyberKey . . . has reported record earnings . . . . CyberKey . . . realized significant financial gains in the first two quarters of 2006, when they announced that the Company reported a total Net Income of $12,152,060." |
| 1/29/07 | "CyberKey . . . is pleased to announce that the Company has reported net earnings of $12,884,030 for the fiscal year 2006. . . . According to the [company's] unaudited financial statements, CyberKey . . . has generated over $33,000,000 in revenues, which includes the purchase order from various agencies for 150,000 CyberKey units." |
| 2/1/07 | "CyberKey . . . recently announced that the Company has reports net earnings of $12,884,030 for the fiscal year 2006." |
| Interspersed throughout this period | [25 statements identical to that of 9/6/06] |

47.     CyberKey's story did not get better after August 8.  For example, Plant told K. Jablon in early September 2006 that he had received a second $4 million check from DHS.  However, when K. Jablon called CyberKey's offices to discuss a press release about the payment, CyberKey's chief financial officer ("CFO") responded, "What payment?"  After K. Jablon informed M. Jablon about this odd response, M. Jablon told K. Jablon to go to CyberKey's Utah offices in person to confirm the payments from DHS.  When K. Jablon arrived at CyberKey's offices, Plant and his assistant Ruth Lane avoided him for two days and made it impossible to confirm that CyberKey had received any payments from DHS at all.  K. Jablon reported to M. Jablon about his inability to confirm the payment in Utah and further discussed his doubts about CyberKey's financial situation with M. Jablon.

48.     At the same time Big Apple disseminated CyberKey press releases, Big Apple continued to use its telephone calling room services to market and promote CyberKey stock to brokers.  These promotions highlighted CyberKey's claim that it had received a purchase order from DHS or other Federal government agencies.  Big Apple's

callers used new CyberKey press releases, typically with accompanying bullet sheets, as talking points to let brokers know what was happening with the company. The callers typically mentioned CyberKey's trading volume when pitching the company's shares to brokers. Maguire and M. Jablon supervised these callers and their misrepresentations and omissions to the brokers.

49.     Big Apple's callers did not disclose the extent of Big Apple's relationship with CyberKey or other important information. In particular, they did not mention that MJMM: (1) had received shares from the company at a 50 percent discount to the market price, or was otherwise being compensated to promote CyberKey shares; (2) was essentially financing CyberKey's operations through purchases of those shares; and (3) was selling CyberKey shares at the same time the phone room callers were soliciting more investments in CyberKey. Defendants M. Jablon and Maguire supervised and directed the callers' misrepresentations and omissions to the registered brokers.

50.     From about December 2005 through about March 2007, Big Apple's telephone calling room helped create a deep market for CyberKey's securities. Specifically, its callers facilitated the sale of hundreds of millions of shares, driving the company's share price to four times its level before these misrepresentations, on trading volume 20-140 times greater than that which preceded the promotional campaign. Big Apple compensated its callers with bonuses based on how many "cold" calls they made and how many brokers they convinced to enter the market and trade CyberKey shares.

51.     Big Apple and MJMM did not stop selling CyberKey stock after learning of the DHS inquiry in August 2006. Instead, the volume of Big Apple's and MJMM's sales of CyberKey stock skyrocketed. Between June 2005 and August 9, 2006, Big

Apple and MJMM generated over $1.5 million in sales of CyberKey stock. Between August 9, 2006, and March 15, 2007, when CyberKey publicly acknowledged its fraud, Big Apple and MJMM sold over 380 million shares of CyberKey stock for total proceeds of about $6.4 million.

52.     During the events relevant to this Complaint, Maguire personally sold over $10,000 worth of unregistered CyberKey shares.

53.     At no point before March 19, 2007, did any of the individual Defendants publicly correct the misimpression left on the market that CyberKey actually had a $25 million purchase order from DHS.

**E.     Big Apple's and MJMM's Participation as Unregistered Brokers and Dealers in CyberKey Stock**

54.     In distributing CyberKey stock to the public market, Big Apple and MJMM acted as brokers by participating in securities transactions at key points in the chain of distribution. In fact, most of the CyberKey stock that reached the public market was funneled through Big Apple and MJMM.

55.     Big Apple and MJMM also acted as dealers in CyberKey stock by, among other things, participating in an underwriting with respect to that stock and demonstrating a willingness to sell CyberKey stock on a continuous basis. Big Apple and MJMM also received dealer-type compensation, profiting on the spread between the deeply-discounted purchase price and the price at which the shares were ultimately sold in the open market. However, neither Big Apple nor MJMM were ever registered with the Commission as brokers or dealers.

56.     As CEO of Big Apple, M. Jablon oversaw every aspect of his company's relationship with CyberKey, including Big Apple's editing and drafting of press releases

- 17 -

for CyberKey. He ultimately supervised Big Apple's telephone calling room and directed Maguire to ensure that specific quantities of CyberKey stock were sold on the open market. M. Jablon was aware of every facet of Big Apple's business and its relationship with the registered representatives it called to solicit interest in CyberKey stock. Because of the conduct described in this paragraph and elsewhere in this Complaint, M. Jablon knowingly provided substantial assistance to Big Apple's and MJMM's violations of Section 15(a).

57.     As Vice President of Big Apple, Maguire oversaw the telephone calling room floor and the calls to registered brokers. Maguire also supervised trading for Big Apple and was closely involved with the sale of shares on behalf of both Big Apple and MJMM. Because Maguire was aware of the inner workings of Big Apple's telephone calling room and its relationship with the registered representatives it called to solicit interest in CyberKey stock, he knowingly provided substantial assistance to Big Apple's and MJMM's violations of Section 15(a).

58.     Kaley served as MJMM's president throughout the period relevant to this memorandum. He worked closely with Plant and helped draft and edit press releases for CyberKey. As Big Apple's corporate counsel, Kaley also helped negotiate the original and renewed consulting agreements between MJMM and CyberKey. Kaley was aware of the sales of CyberKey stock by MJMM throughout the company's relationship with CyberKey and profited greatly from them. Kaley knew that the press releases for CyberKey would create interest in CyberKey shares, and that Big Apple and MJMM would profit greatly from the sale of CyberKey stock as a result of their consulting agreements with CyberKey. Kaley therefore knowingly provided substantial assistance

to Big Apple's and MJMM's violations of Section 15(a).

**F.     Defendants Profited As A Result Of Their Relationship With CyberKey**

59.     Before it began its relationship with CyberKey, Big Apple was not a very profitable company. In 2004, Big Apple generated approximately $2.4 million in revenue, but recorded no profit. In 2005, the year that CyberKey became a client of Big Apple, the company's gross profit rose to over $5 million. In 2006, when Big Apple was actively engaged in promoting CyberKey's purported contract with DHS , Big Apple's cash inflow nearly tripled, exceeding $14 million for that fiscal year. MJMM and Big Apple realized over $5.5 million from selling CyberKey shares in 2006 and over $9.6 million by the first half of 2007.

60.     The individual Defendants directly benefited from the inflow of cash into Big Apple. From 2005 to 2006, M. Jablon's total compensation rose from $133,238 to $648,341, Maguire's compensation rose from to $147,188 to $646,312, Kaley's compensation rose from $91,259 to $753,950, and K. Jablon's compensation rose from to $55,648 to $174,035. Each of these individuals was personally involved in CyberKey's relationship with Big Apple and each was personally responsible for some aspect of the relationship.

<u>**CLAIMS FOR RELIEF**</u>

<u>**FIRST CLAIM**</u>
**(Keith Jablon)**

**[Violations of Section 17(a) of the Securities Act 15, U.S.C. § 77q(a)]**

61.     Paragraphs 1 through 60 are re-alleged and incorporated herein by reference.

62.     As described above, K. Jablon, directly or indirectly, in the offer or sale of

- 19 -

CyberKey securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, knowingly, recklessly or negligently:

        a.      employed devices, schemes or artifices to defraud;

        b.      obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

        c.      engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of CyberKey securities.

63.     K. Jablon's scheme included, among others, the following fraudulent acts, untrue statements of material fact and material omissions:

        a.      Between August 2006 and February 2007, K. Jablon engaged in fraudulent acts by conceiving, drafting, editing, timing or supervising the drafting or editing of press releases that created the false appearance that CyberKey had generated $25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 3, 25, and 46. K. Jablon knew, or was severely reckless or negligent in not knowing, that these press releases were false, as described in paragraphs 5, 31, 32, 34, 35-38, and 40-42, 44, and 45.

        b.      Between August 2006 and March 2007, K. Jablon engaged in fraudulent acts by omitting to correct the misimpression the press releases described in paragraph 46 had left on the market, as described in paragraph 53.

64.     By reason of the foregoing, Defendant K. Jablon violated, and

unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. §

77q(a)].

## SECOND CLAIM
### (Mark Kaley)

**[Violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a)]**

65.     Paragraphs 1 through 60 are re-alleged and incorporated herein by

reference.

66.     As described above, Kaley, directly or indirectly, in the offer or sale of

CyberKey securities, by the use of means or instruments of transportation or

communication in interstate commerce or by the use of the mails, knowingly, recklessly

or negligently:

    a.   employed devices, schemes or artifices to defraud;

    b.   obtained money or property by means of untrue statements of

material fact or by omitting to state material facts necessary in order to make the

statements made, in the light of the circumstances under which they were made,

not misleading; or

    c.   engaged in transactions, practices or courses of business which

operated or would operate as a fraud or deceit upon the purchasers of CyberKey

securities.

67.     Kaley's scheme included, among others, the following

fraudulent acts, untrue statements of material fact and material omissions:

    a.       Between August 2006 and February 2007, Kaley engaged in

fraudulent acts by conceiving, drafting, editing, timing or supervising the drafting

or editing of press releases that created the false appearance that CyberKey had generated $25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 3, 25, and 46.  Kaley knew, or was severely reckless or negligent in not knowing, that these press releases were false, as described in paragraphs 5, 31-34, and 36-45.

    b.    Between August 2006 and March 2007, Kaley engaged in fraudulent acts by omitting to correct the misimpression the press releases described in paragraph 46 had left on the market, as described in paragraph 53.

68.    By reason of the foregoing, Defendant Kaley violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM
### (Matthew Maguire)

**[Violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a)]**

69.  Paragraphs 1 through 60 above are re-alleged and incorporated herein by reference.

70.  As described above, Maguire, directly or indirectly, in the offer or sale of CyberKey securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, knowingly, recklessly or negligently:

    a.    employed devices, schemes or artifices to defraud;

    b.    obtained money or property by means of untrue statements of

material fact or by omitting to state material facts necessary in order to make the

statements made, in the light of the circumstances under which they were made, not

misleading; or

       c.   engaged in transactions, practices or courses of business which

operated or would operate as a fraud or deceit upon the purchasers of CyberKey

securities.

    71.  Maguire's scheme included, among others, the following

fraudulent acts, untrue statements of material fact and material omissions:

       a.   Between August 2006 and March 2007, Maguire engaged in

fraudulent acts by supervising a telephone calling room of approximately 14-50

callers to market and promote CyberKey stock to registered brokers.  These

callers created the false appearance that CyberKey had generated approximately

$25 million in revenue from a purchase order from the Department of Homeland

Security, as described in paragraphs 4, 18, 25, 48, and 50.  Maguire knew, or was

severely reckless in not knowing, that the callers' statements were false, as

described in paragraphs 31-33, 38, and 44.

       b.   Between August 2006 and March 2007, Maguire engaged in

fraudulent acts by omitting to correct the misimpression the telephone calls

described in paragraphs 4, 18, 25, 48, and 50 had left on the market, as described

in paragraph 53.

    72.  By reason of the foregoing, Defendant Maguire violated, and unless enjoined

will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## FOURTH CLAIM
### (Marc Jablon)

**[Violations of Section 17(a) of the Securities Act 15 U.S.C. § 77q(a)]**

73. Paragraphs 1 through 60 are re-alleged and incorporated herein by reference.

74. As described above, Jablon, directly or indirectly, in the offer or sale of CyberKey securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, knowingly, recklessly or negligently:

    a.   employed devices, schemes or artifices to defraud;

    b.   obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    c.   engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of CyberKey securities.

75. M. Jablon's scheme included, among others, the following fraudulent acts, untrue statements of material fact and material omissions:

    a.      Between August 2006 and February 2007, M. Jablon engaged in fraudulent acts by conceiving, drafting, editing, timing or supervising the drafting or editing of press releases that created the false appearance that CyberKey had generated approximately $25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 3, 25, and 46.

- 24 -

M. Jablon knew, or was severely reckless or negligent in not knowing, that these press releases were false, as described in paragraphs 5, 31-38, 40-45 and 47.

   b.   Between August 2006 and March 2007, M. Jablon engaged in fraudulent acts by supervising a telephone calling room of approximately 14-50 callers to market and promote CyberKey stock to registered brokers.  These callers created the false appearance that CyberKey had generated approximately $25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 4, 17, 25, 48, and 50.  M. Jablon knew, or was severely reckless in not knowing, that the callers' statements were false, as described in paragraphs 31-33, 38, 43, 44, and 47.

   c.   Between August 2006 and March 2007, M. Jablon engaged in fraudulent acts by omitting to correct the misimpression the press releases described in paragraph 46 and the telephone calls described in paragraphs 4, 17, 25, 48, and 50 had left on the market, as described in paragraph 53.

76.   By reason of the foregoing, Defendant M. Jablon violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## FIFTH CLAIM
### (Big Apple)

### (Violations of Section 17(a) of the Securities Act 15 U.S.C. § 77q(a))

77.   Paragraphs 1 through 76 above are re-alleged and incorporated herein by reference.

78.   Big Apple is liable for the actions of its officers and employees, including M. Jablon, K. Jablon, Maguire and Kaley.  K. Jablon violated Section 17(a) of the Securities Act as described in the First Claim for Relief, above, which is incorporated by

reference. K. Jablon violated Section 17(a) of the Securities Act as described in the Second Claim for Relief, above, which is incorporated by reference. Maguire violated Section 17(a) of the Securities Act as described in the Third Claim for Relief, above, which is incorporated by reference. M. Jablon violated Section 17(a) of the Securities Act as described in the Fourth Claim for Relief, above, which is incorporated by reference.

79.    As described above, M. Jablon, K. Jablon, Maguire, and Kaley, at M. Jablon's direction, directly or indirectly, in the offer or sale of CyberKey securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, knowingly, recklessly or negligently:

a.    employed devices, schemes or artifices to defraud;

b.    obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c.    engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of CyberKey securities.

80.    K. Jablon's scheme included, among others, the following fraudulent acts, untrue statements of material fact and material omissions:

a.    Between August 2006 and February 2007, K. Jablon engaged in fraudulent acts by conceiving, drafting, editing, timing or supervising the drafting or editing of press releases that created the false appearance that CyberKey had

- 26 -

generated $25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 3, 25, and 46. K. Jablon knew, or was severely reckless or negligent in not knowing, that these press releases were false, as described in paragraphs 5, 31, 34, 35-38, 40-45, and 47.

        b.       Between August 2006 and March 2007, K. Jablon engaged in fraudulent acts by omitting to correct the misimpression the press releases described in paragraph 46 had left on the market, as described in paragraph 52.

81.      Kaley's scheme included, among others, the following fraudulent acts, untrue statements of material fact and material omissions:

        a.       Between August 2006 and February 2007, Kaley engaged in fraudulent acts by conceiving, drafting, editing, timing or supervising the drafting or editing of press releases that created the false appearance that CyberKey had generated approximately $25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 3, 25, and 46. Kaley knew, or was severely reckless or negligent in not knowing, that these press releases were false, as described in paragraphs 5, 31-34, 36-45 and 47.

        b.       Between August 2006 and March 2007, Kaley engaged in fraudulent acts by omitting to correct the misimpression the press releases described in paragraph 46 had left on the market, as described in paragraph 53.

82.      Maguire's scheme included, among others, the following fraudulent acts, untrue statements of material fact and material omissions:

        a.       Between August 2006 and March 2007, Maguire engaged in fraudulent acts by supervising a telephone calling room of approximately 14-50

callers to market and promote CyberKey stock to registered brokers. These callers created the false appearance that CyberKey had generated approximately $25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 4, 18, 25, 48, and 50. Maguire knew, or was severely reckless in not knowing, that the callers' statements were false, as described in paragraphs 31-33, 38, and 44.

      b.      Between August 2006 and March 2007, Maguire engaged in fraudulent acts by omitting to correct the misimpression the telephone calls described in paragraphs 4, 18, 25, 48, and 50 had left on the market, as described in paragraph 53.

83.      M. Jablon's scheme included, among others, the following fraudulent acts, untrue statements of material fact and material omissions:

      a.      Between August 2006 and February 2007, M. Jablon engaged in fraudulent acts by conceiving, drafting, editing, timing or supervising the drafting or editing of press releases that created the false appearance that CyberKey had generated approximately $25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 3, 25, and 46. M. Jablon knew, or was severely reckless or negligent in not knowing, that these press releases were false, as described in paragraphs 5, 31-38, 40-45 and 47.

      b.      Between August 2006 and March 2007, M. Jablon engaged in fraudulent acts by supervising a telephone calling room of approximately 14-50 callers to market and promote CyberKey stock to registered brokers. These callers created the false appearance that CyberKey had generated approximately

$25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 4, 17, 25, 48, and 50.  M. Jablon knew, or was severely reckless in not knowing, that the callers' statements were false, as described in paragraphs 31-33, 38, 43, 44 and 47.

        c.       Between August 2006 and March 2007, M. Jablon engaged in fraudulent acts by omitting to correct the misimpression the press releases described in paragraph 46 and the telephone calls described in paragraphs 4, 17, 25, 48, and 50 had left on the market, as described in paragraph 53.

84.     By reason of the foregoing, Big Apple violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SIXTH CLAIM
### (MJMM)

**(Violations of Section 17(a) of the Securities Act 15 U.S.C. § 77q(a))**

85.     Paragraphs 1 through 76 above are re-alleged and incorporated herein by reference.

86.     MJMM is liable for the actions of its officers and employees, including M. Jablon and Kaley.  Kaley violated Section 17(a) of the Securities Act as described in the Second Claim for Relief, above, which is incorporated by reference.  M. Jablon violated Section 17(a) of the Securities Act as described in the Fourth Claim for Relief, above, which is incorporated by reference.

87.     As described above, M. Jablon and Kaley, at M. Jablon's direction, directly or indirectly, in the offer or sale of CyberKey securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, knowingly, recklessly or negligently:

a.   employed devices, schemes or artifices to defraud;

b.   obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c.   engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of CyberKey securities.

88.  Kaley's scheme included, among others, the following fraudulent acts, untrue statements of material fact and material omissions:

a.   Between August 2006 and February 2007, Kaley engaged in fraudulent acts by conceiving, drafting, editing, timing or supervising the drafting or editing of press releases that created the false appearance that CyberKey had generated approximately $25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 3, 25, and 46. Kaley knew, or was severely reckless or negligent in not knowing, that these press releases were false, as described in paragraphs 5, 31, 33, 34, and 36-45.

b.   Between August 2006 and March 2007, Kaley engaged in fraudulent acts by omitting to correct the misimpression the press releases described in paragraph 46 had left on the market, as described in paragraph 53.

89.  M. Jablon's scheme included, among others, the following fraudulent acts, untrue statements of material fact and material omissions:

a.      Between August 2006 and February 2007, M. Jablon engaged in fraudulent acts by conceiving, drafting, editing, timing or supervising the drafting or editing of press releases that created the false appearance that CyberKey had generated approximately $25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 3, 25, and 46. M. Jablon knew, or was severely reckless or negligent in not knowing, that these press releases were false, as described in paragraphs 5, 31-38, 40-45 and 47.

b.      Between August 2006 and March 2007, M. Jablon engaged in fraudulent acts by supervising a telephone calling room of approximately 14-50 callers to market and promote CyberKey stock to registered brokers.  These callers created the false appearance that CyberKey had generated approximately $25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 4, 17, 25, 48, and 50.  M. Jablon knew, or was severely reckless in not knowing, that the callers' statements were false, as described in paragraphs 31-33, 38, 43, 44, and 47.

c.      Between August 2006 and March 2007, M. Jablon engaged in fraudulent acts by omitting to correct the misimpression the press releases described in paragraph 46 and the telephone calls described in paragraphs 4, 17, 25, 48, and 50 had left on the market, as described in paragraph 53.

90.  By reason of the foregoing, MJMM violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SEVENTH CLAIM
### (Keith Jablon)
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5)

91. Paragraphs 1 through 64 are re-alleged and incorporated herein by reference.

92. As described above, K. Jablon, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly:

  a.  employed devices, schemes or artifices to defraud;

  b.  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

  c.  engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

93. K. Jablon's scheme included, among others, the following fraudulent acts, untrue statements of material fact and material omissions:

  a.  Between August 2006 and February 2007, K. Jablon engaged in fraudulent acts by conceiving, drafting, editing, timing or supervising the drafting or editing of press releases that created the false appearance that CyberKey had generated $25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 3, 25, and 46. K. Jablon knew, or was severely reckless or negligent in not knowing, that these press releases were false, as described in paragraphs 5, 31, 32, 34-38, 40-42, 44, 45, and 47.

b.      Between February 2007 and March 2007, K. Jablon engaged in

fraudulent acts by omitting to correct the misimpression the press releases

described in paragraph 46 had left on the market, as described in paragraph 53.

94. By reason of the foregoing, Defendant K. Jablon violated, and

unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §

78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### EIGHTH CLAIM
#### (Mark Kaley)
#### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5)

94. Paragraphs 1 through 60 and 65-68 are re-alleged and incorporated herein

by reference.

95. As described above, Kaley, directly or indirectly, in connection with

the purchase or sale of securities, by the use of means or instrumentalities of interstate

commerce, or of the mails, or of a facility of a national securities exchange, knowingly or

recklessly:

a.      employed devices, schemes or artifices to defraud;

b.      made untrue statements of material facts or omitted to state

material facts necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading; or

c.      engaged in acts, practices or courses of business which operated or

would operate as a fraud or deceit upon other persons.

96. Kaley's scheme included, among others, the following

fraudulent acts, untrue statements of material fact and material omissions:

a.       Between August 2006 and February 2007, Kaley engaged in fraudulent acts by conceiving, drafting, editing, timing or supervising the drafting or editing of press releases that created the false appearance that CyberKey had generated $25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 3, 25, and 46.  Kaley knew, or was severely reckless or negligent in not knowing, that these press releases were false, as described in paragraphs 5, 31-34, and 36-45.

b.       Between August 2006 and March 2007, Kaley engaged in fraudulent acts by omitting to correct the misimpression the press releases described in paragraph 46 had left on the market, as described in paragraph 53.

97.  By reason of the foregoing, Defendant Kaley violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## NINTH CLAIM
### (Matthew Maguire)
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5)

98.  Paragraphs 1 through 60 and 69-72 are re-alleged and incorporated herein by reference.

99.  As described above, Maguire, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly:

a.       employed devices, schemes or artifices to defraud;

b.      made untrue statements of material facts or omitted to state
material facts necessary in order to make the statements made, in the light of the
circumstances under which they were made, not misleading; or

c.      engaged in acts, practices or courses of business which operated or
would operate as a fraud or deceit upon other persons.

100.    Maguire's scheme included, among others, the following
fraudulent acts, untrue statements of material fact and material omissions:

a.      Between August 2006 and March 2007, Maguire engaged in
fraudulent acts by supervising a telephone calling room of approximately 14-50
callers to market and promote CyberKey stock to registered brokers.  These
callers created the false appearance that CyberKey had generated approximately
$25 million in revenue from a purchase order from the Department of Homeland
Security, as described in paragraphs 4, 18, 25, 48, and 50.  Maguire knew, or was
severely reckless in not knowing, that the callers' statements were false, as
described in paragraphs 31-33, 38, and 44.

b.      Between August 2006 and March 2007, Maguire engaged in
fraudulent acts by omitting to correct the misimpression the telephone calls
described in paragraphs 4, 18, 25, 48, and 50 had left on the market, as described
in paragraph 53.

101.    By reason of the foregoing, Defendant Maguire violated, and
unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §
78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### TENTH CLAIM
### (Marc Jablon)
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5)

102.    Paragraphs 1 through 60 and 73-76 are realleged and incorporated herein by reference.

103.    As described above, M. Jablon, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly:

      a.    employed devices, schemes or artifices to defraud;

      b.    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

      c.    engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

104.    M. Jablon's scheme included, among others, the following fraudulent acts, untrue statements of material fact and material omissions:

      a.    Between August 2006 and February 2007, M. Jablon engaged in fraudulent acts by conceiving, drafting, editing, timing or supervising the drafting or editing of press releases that created the false appearance that CyberKey had generated approximately $25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 3, 25, and 46. M. Jablon knew, or was severely reckless or negligent in not knowing, that these press releases were false, as described in paragraphs 5, 31-38, 40-45 and 47.

b.     Between August 2006 and March 2007, M. Jablon engaged in

fraudulent acts by supervising a telephone calling room of approximately 14-50

callers to market and promote CyberKey stock to registered brokers.  These

callers created the false appearance that CyberKey had generated approximately

$25 million in revenue from a purchase order from the Department of Homeland

Security, as described in paragraphs 4, 17, 25, 48, and 50.  M. Jablon knew, or

was severely reckless in not knowing, that the callers' statements were false, as

described in paragraphs 31-33, 38, 43, 44, and 47.

c.     Between August 2006 and March 2007, M. Jablon engaged in

fraudulent acts by omitting to correct the misimpression the press releases

described in paragraph 46 and the telephone calls described in paragraphs 4, 17,

25, 48, and 50 had left on the market, as described in paragraph 53.

105.   By reason of the foregoing, Defendant M. Jablon violated, and

unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §

78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## ELEVENTH CLAIM
### (Big Apple)
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5)

106.   Paragraphs 1 through 83 are re-alleged and incorporated herein by

reference.

107.   Big Apple is liable for the actions of its officers and employees, including

M. Jablon, K. Jablon, Maguire and Kaley.  K. Jablon violated Section 10(b) of the

Exchange Act and Rule 10b-5 as described in the Seventh Claim for Relief, above, which

is incorporated by reference. Kaley violated Section 10(b) of the Exchange Act and Rule 10b-5 as described in the Eighth Claim for Relief, above, which is incorporated by reference. Maguire violated Section 10(b) of the Exchange Act and Rule 10b-5 as described in the Ninth Claim for Relief, above, which is incorporated by reference. M. Jablon violated Section 10(b) of the Exchange Act and Rule 10b-5 as described in the Tenth Claim for Relief, above, which is incorporated by reference.

108.    As described above, M. Jablon, K. Jablon, Maguire and Kaley directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly:

a.    employed devices, schemes or artifices to defraud;

b.    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c.    engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

109.    K. Jablon's scheme included, among others, the following fraudulent acts, untrue statements of material fact and material omissions:

a.    Between August 2006 and February 2007, K. Jablon engaged in fraudulent acts by conceiving, drafting, editing, timing or supervising the drafting or editing of press releases that created the false appearance that CyberKey had generated $25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 3, 25, and 46. K. Jablon knew, or

was severely reckless or negligent in not knowing, that these press releases were false, as described in paragraphs 5, 31, 34, 35-38, 40-45, and 47.

        b.      Between August 2006 and March 2007, K. Jablon engaged in fraudulent acts by omitting to correct the misimpression the press releases described in paragraph 46 had left on the market, as described in paragraph 53.

    110.    Kaley's scheme included, among others, the following fraudulent acts, untrue statements of material fact and material omissions:

        a.      Between August 2006 and February 2007, Kaley engaged in fraudulent acts by conceiving, drafting, editing, timing or supervising the drafting or editing of press releases that created the false appearance that CyberKey had generated approximately $25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 3, 25, and 46. Kaley knew, or was severely reckless or negligent in not knowing, that these press releases were false, as described in paragraphs 5, 31-34, and 36-45.

        b.      Between August 2006 and March 2007, Kaley engaged in fraudulent acts by omitting to correct the misimpression the press releases described in paragraph 46 had left on the market, as described in paragraph 53.

    111.    Maguire's scheme included, among others, the following fraudulent acts, untrue statements of material fact and material omissions:

        a.      Between August 2006 and March 2007, Maguire engaged in fraudulent acts by supervising a telephone calling room of approximately 14-50 callers to market and promote CyberKey stock to registered brokers. These callers created the false appearance that CyberKey had generated approximately

$25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 4, 18, 25, 48, and 50.  Maguire knew, or was severely reckless in not knowing, that the callers' statements were false, as described in paragraphs 31-33, 38, and 44.

      b.      Between August 2006 and March 2007, Maguire engaged in fraudulent acts by omitting to correct the misimpression the telephone calls described in paragraphs 4, 18, 25, 48, and 50 had left on the market, as described in paragraph 53.

112.    M. Jablon's scheme included, among others, the following fraudulent acts, untrue statements of material fact and material omissions:

      a.      Between August 2006 and February 2007, M. Jablon engaged in fraudulent acts by conceiving, drafting, editing, timing or supervising the drafting or editing of press releases that created the false appearance that CyberKey had generated approximately $25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 3, 25, and 46. M. Jablon knew, or was severely reckless or negligent in not knowing, that these press releases were false, as described in paragraphs 5, 31-38, 40-45 and 47.

      b.      Between August 2006 and March 2007, M. Jablon engaged in fraudulent acts by supervising a telephone calling room of approximately 14-50 callers to market and promote CyberKey stock to registered brokers.  These callers created the false appearance that CyberKey had generated approximately $25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 4, 17, 25, 48, and 50.  M. Jablon knew, or

was severely reckless in not knowing, that the callers' statements were false, as described in paragraphs 31-33, 38, 43, 44, and 47.

       c.       Between August 2006 and March 2007, M. Jablon engaged in fraudulent acts by omitting to correct the misimpression the press releases described in paragraph 46 and the telephone calls described in paragraphs 4, 17, 25, 48, and 50 had left on the market, as described in paragraph 53.

    113.    By reason of the foregoing, Big Apple violated and, unless permanently enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**TWELFTH CLAIM**
**(MJMM)**
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5)**

    114.    Paragraphs 1 through 76 and 85 through 90 are realleged and incorporated herein by reference.

    115.    MJMM is liable for the actions of its officers and employees, including M. Jablon and Kaley. Kaley violated Section 10(b) of the Exchange Act and Rule 10b-5 as described in the Eighth Claim for Relief, above, which is incorporated by reference. M. Jablon violated Section 10(b) of the Exchange Act and Rule 10b-5 as described in the Tenth Claim for Relief, above, which is incorporated by reference.

    116.    As described above, M. Jablon and Kaley directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly:

       a.       employed devices, schemes or artifices to defraud;

- 41 -

      b.     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

      c.     engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

117.    Kaley's scheme included, among others, the following fraudulent acts, untrue statements of material fact and material omissions:

      a.     Between August 2006 and February 2007, Kaley engaged in fraudulent acts by conceiving, drafting, editing, timing or supervising the drafting or editing of press releases that created the false appearance that CyberKey had generated approximately $25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 3, 25, and 46. Kaley knew, or was severely reckless or negligent in not knowing, that these press releases were false, as described in paragraphs 5, 31, 33, 34, and 36-45.

      b.     Between August 2006 and March 2007, Kaley engaged in fraudulent acts by omitting to correct the misimpression the press releases described in paragraph 46 had left on the market, as described in paragraph 53.

118.    M. Jablon's scheme included, among others, the following fraudulent acts, untrue statements of material fact and material omissions:

      a.     Between August 2006 and February 2007, M. Jablon engaged in fraudulent acts by conceiving, drafting, editing, timing or supervising the drafting or editing of press releases that created the false appearance that CyberKey had generated approximately $25 million in revenue from a purchase order from the

Department of Homeland Security, as described in paragraphs 3, 25, and 46. M. Jablon knew, or was severely reckless or negligent in not knowing, that these press releases were false, as described in paragraphs 5, 31-38, 40-45 and 47.

b.     Between August 2006 and March 2007, M. Jablon engaged in fraudulent acts by supervising a telephone calling room of approximately 14-50 callers to market and promote CyberKey stock to registered brokers. These callers created the false appearance that CyberKey had generated approximately $25 million in revenue from a purchase order from the Department of Homeland Security, as described in paragraphs 4, 17, 25, 48, and 50. M. Jablon knew, or was severely reckless in not knowing, that the callers' statements were false, as described in paragraphs 31-33, 38, 43, 44, and 47.

c.     Between August 2006 and March 2007, M. Jablon engaged in fraudulent acts by omitting to correct the misimpression the press releases described in paragraph 46 and the telephone calls described in paragraphs 4, 17, 25, 48, and 50 had left on the market, as described in paragraph 53.

119.     By reason of the foregoing, MJMM violated and, unless permanently enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRTEENTH CLAIM
### (Big Apple)
### (Violations of Sections 5(a) and 5(c) of the Securities Act)

120.     Paragraphs 1 through 52 are realleged and incorporated herein by reference.

121.     Defendant Big Apple, by engaging in the conduct described above,

- 43 -

directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer and sell a security when no registration statement was in effect as to the security or carried or caused to be carried through the mails or in interstate commerce such security for the purpose of sale or for delivery after sale, as described in paragraphs 2, 6, 27, 28, and 50, 51, 54, and 55.

122.    By reason of the foregoing, Big Apple violated and, unless permanently enjoined, will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e].

**FOURTEENTH CLAIM**
**(MJMM)**
**(Violations of Sections 5(a) and 5(c) of the Securities Act)**

123.    Paragraphs 1 through 52 are realleged and incorporated herein by reference.

124.    Defendant MJMM, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer and sell a security when no registration statement was in effect as to the security or carried or caused to be carried through the mails or in interstate commerce such security for the purpose of sale or for delivery after sale, as described in paragraphs 2, 6, 27, 28, and 50, 51, 54, and 55.

125.    By reason of the foregoing, MJMM violated and, unless permanently enjoined, will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e].

## FIFTEENTH CLAIM
### (Marc Jablon)
### (Violations of Sections 5(a) and 5(c) of the Securities Act)

126.     Paragraphs 1 through 52 are realleged and incorporated herein by reference.

127.     Defendant M. Jablon, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer and sell a security when no registration statement was in effect as to the security or carried or caused to be carried through the mails or in interstate commerce such security for the purpose of sale or for delivery after sale, as described in paragraphs 2, 6, 27, 28, 50, 51, and 53-57.

128.     By reason of the foregoing, M. Jablon violated and, unless permanently enjoined, will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e].

## SIXTEENTH CLAIM
### (Matthew Maguire)
### (Violations of Sections 5(a) and 5(c) of the Securities Act)

129.     Paragraphs 1 through 52 are re-alleged and incorporated herein by reference.

130.     Defendant Maguire, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer and sell a security when no registration statement was in effect as to the security or carried or caused to be carried

through the mails or in interstate commerce such security for the purpose of sale or for delivery after sale, as described in paragraphs 2, 6, 27, 28, and 50-57.

131.   By reason of the foregoing, Maguire violated and, unless permanently enjoined, will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e].

## SEVENTEENTH CLAIM
### (Big Apple and MJMM)
### Violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]

132.   Paragraphs 1 through 60 are re-alleged and incorporated herein by reference above.

133.   As set forth more fully above, Big Apple and MJMM, directly or indirectly, singly or in concert, while acting as a broker or dealer, have made use of the mails or any means or instrumentality of interstate commerce in effecting transactions in or inducing or attempting to induce the purchase or sale of securities when such persons or entities were not registered with the SEC as a broker or dealer or when such persons were not associated with an entity registered with the SEC as a broker-dealer.

134.   By reason of the foregoing, Big Apple and MJMM have violated Section 15(a) of the Exchange Act [15 U.S.C. §§ 78o(a)].

## EIGHTEENTH CLAIM

### (Marc Jablon, Matthew Maguire and Mark Kaley)
### Aiding and Abetting Big Apple's and MJMM's Violations of
### Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]

135.   The Commission re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 60 and paragraphs 132 through 135 above.

136.   Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] provides that any

person that knowingly provides substantial assistance to another person in violation of a provision of the Exchange Act, or any rule or regulation thereunder, shall be deemed to be in violation of such provision to the same extent as the person to who such assistance is provided.

137. Based on the conduct alleged herein, Big Apple and MJMM violated Section 15(a) of the Exchange Act by acting as brokers and dealers with respect to CyberKey securities without being registered as such with the SEC.

138. Defendants Marc Jablon, Matthew Maguire, and Mark Kaley, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance to Big Apple and MJMM in connection with their violations of Section 15(a).

139. By reason of the foregoing, Marc Jablon, Maguire, and Kaley aided and abetted Big Apple's and MJMM's violations of Section 15(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the Securities and Exchange Commission, respectfully requests that this Court enter a judgment:

(1) permanently restraining and enjoining Big Apple, MJMM, Marc Jablon, and Mathew Maguire and their agents, servants, employees, attorneys, and all persons in active concert or participation with Big Apple, MJMM, Marc Jablon, or Mathew Maguire who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], and Sections 15(a) and 10(b) of the Exchange Act [15 U.S.C. §§ 78o(a) and 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

(2) permanently restraining and enjoining Mark Kaley and his agents, servants,

employees, attorneys, and all persons in active concert or participation with Mark Kaley who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Sections 15(a) and 10(b) of the Exchange Act [15 U.S.C. §§ 78o(a) and 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

(3) permanently restraining and enjoining Keith Jablon and his agents, servants, employees, attorneys, and all persons in active concert or participation with Keith Jablon who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

(4) permanently restraining and enjoining Big Apple, MJMM, Marc Jablon, and Matthew Maguire from participating in an offering of penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)(1)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(6)(A)].

(5) requiring the Defendants to pay an amount equal to all moneys they obtained through the illegal activities described above plus prejudgment interest thereon, and to pay civil penalties pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and

(6) granting such other relief as this Court deems just and proper.

Dated:  November 16, 2009                    Respectfully submitted,

Of Counsel:                                  _Jeffrey T. Infelise_
Cheryl J. Scarboro                           Jeffrey T. Infelise
Thomas A. Sporkin                            Assistant Chief Litigation Counsel
David R. Herman                              D.C. Bar No. 456998
David Smyth                                  Tel:  (202) 551-4904
                                             Fax:  (202)772-9362
                                             E-mail: infelisej@sec.gov
                                             *Lead and Trial Counsel*

                                             Attorneys for Plaintiff
                                             U.S. Securities and Exchange Commission
                                             100 F Street, N.E.
                                             Washington, DC 20549-4010