# United States District Court
## Middle District of Florida
### Orlando Division

**U.S. SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

**-vs-**                                    **Case No.  6:09-cv-1963-Orl-28GJK**

**BIG APPLE CONSULTING USA, INC., MJMM INVESTMENTS, LLC, MARC JABLON, MATTHEW MAGUIRE, MARK C. KALEY, KEITH JABLON,**

**Defendants.**

_____

## ORDER

The Securities and Exchange Commission ("the SEC") brings this action alleging violations of the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. § 77a et seq., and the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78a et seq. Currently before the Court are the SEC's Motion in Limine (Doc. 36) seeking to exclude the testimony of Defendants' expert, Carl N. Duncan, and Defendants' Response (Doc. 46); Defendants' Motion in Limine (Doc. 40) seeking to exclude the testimony of the SEC's expert, Robert W. Lowry, and the SEC's Response (Doc. 44); and the SEC's Corrected Motion for Partial Summary Judgment (Doc. 62) and Defendants' Response (Doc. 63; see also Doc. 52 (adopted by Doc. 63)).  As discussed below, the Defendants' motion in limine must be granted in part and denied in part, and the SEC's motion in limine and motion for partial

summary judgment must be granted.[1]

## Background

Defendant Big Apple Consulting USA, Inc. ("Big Apple") and its wholly owned subsidiary MJMM Investments, LLC ("MJMM") provide investor relations and public relations ("IR/PR") services to microcap companies. (Joint Pretrial Statement ("JPS"), Doc. 65, at 11). During the relevant time period, the individual Defendants controlled Big Apple and MJMM. Defendant Marc Jablon ("M. Jablon") was the president and CEO of Big Apple and co-founded MJMM with Defendant Matthew Maguire ("Maguire"), (id. at 13); Maguire was also the vice president of Big Apple, (id. at 14). Defendant Mark Kaley ("Kaley") was president of MJMM and an officer of Big Apple.[2] (Id.).

The SEC's allegations stem from Defendants' relationship with non-party CyberKey Solutions, Inc.[3] ("CyberKey") and its CEO James Plant ("Plant"). CyberKey sold "USB, flash memory drives and other electronic devices" and was publicly traded on a website called "Pink Sheets" which "displays bid and ask prices for stock traded over-the-counter." (Id. at 10, 15). On June 15, 2005, MJMM entered into a consulting agreement with CyberKey that

---

[1] The Court is aware that the SEC recently filed a motion to amend its complaint; however, the proposed amendment, if granted, would not impact the counts at issue in this Order. On the other hand, because the expert opinions of Defendants' expert Stanley Wunderlich relate to the counts the SEC seek to amend, the Court will defer ruling on the SEC's motion to exclude Wunderlich's opinions (Doc. 37) until it addresses the motion to amend.

[2] The claims against Defendant Keith Jablon, who was the vice president of another Big Apple subsidiary, Management Solutions International, Inc., are not at issue at this time, and therefore all references to "Defendants" herein do not include Keith Jablon.

[3] CyberKey Solutions Inc. was previously known as CyberKey Corp.

enumerated several IR/PR services that MJMM would provide for CyberKey, including promoting CyberKey to brokers.  (Id. at 11).  At the time the agreement was entered into, however, all parties understood that Big Apple and its other subsidiaries, rather than MJMM, would provide the services detailed in the consulting agreement.  (Id.).

As part of its IR/PR services to CyberKey and other clients, Big Apple operated a telephone call room that "was responsible for contacting registered securities brokers and dealers to disseminate public information in order to promote client companies and their stock."  (Id. at 13).  Call room employees "dealt strictly with registered broker-dealers," and Defendants claim that they did not solicit investors directly (id.); however, some of those broker-dealers themselves invested in Big Apple's clients.  (M. Jablon Dep., Dec. 1, 2010 ("M. Jablon Dec. 1 Dep."), Ex. 1 to Doc. 39, at 24).

In exchange for these IR/PR services, the consulting agreement originally provided that CyberKey would pay $50,000 per month; the price was then raised to $80,000 per month commensurate with an increase in services provided–for example, representation in European markets. (Jablon Dec. 1 Dep. at 92, 98).  Due to the fact that CyberKey, like most of MJMM and Big Apple's clients, was a small business in need of capital, it was agreed that CyberKey could make payments in the form of shares of CyberKey stock rather than cash. (JPS at 12).  This agreement was not unique to CyberKey; most of MJMM and Big Apple's clients paid for services in shares of stock.  (Id.).  MJMM and Big Apple would then sell clients' stock in order to pay operating expenses. (Maguire Dep., Ex. 6 to Doc. 39, at 30, 38). MJMM and Big Apple also had the option to, and did, purchase additional CyberKey stock at a discounted rate.  Eventually, MJMM and Big Apple terminated their relationship with

CyberKey, and it came to light that CyberKey and Plant had fraudulently reported a $24.49 million contract with the Department of Homeland Security that did not exist.[4]  (JPS at 13).

## Motions to Exclude

Defendants and the SEC have moved to exclude the testimony of the other side's expert.  As explained in the following discussion, the opinions of Defendants' expert, Carl N. Duncan ("Duncan"), constitute legal conclusions and thus must be excluded.  One of the opinions of the SEC's expert, Robert Lowry ("Lowry"), also constitutes a legal conclusion, but his other opinions are admissible.

I.  Legal Standard

Rule 702 of the Federal Rules of Evidence controls the admission of expert testimony. It allows an expert to give opinion testimony in a case, provided that "scientific, technical, or other specialized knowledge will assist the trier of fact."  Fed. R. Evid. 702.  The expert must be qualified by "knowledge, skill, experience, training, or education" and may testify to an opinion if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Id.

Rule 702 compels courts to perform a "gatekeeping" function–specifically, to determine whether the proffered expert testimony is reliable and relevant.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 n.7, 590-91 (1993).  The Eleventh Circuit has

---

[4] The SEC alleges that Defendants were involved in the fraud perpetrated by CyberKey.  However, neither party has moved for summary judgment on those counts, and the Court will not address them at this time.

highlighted the importance of this gatekeeping function; it is because expert witnesses are free to opine without firsthand knowledge, while relying upon inadmissible hearsay, that courts must carefully judge the intellectual rigor employed by the expert. United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004).  The burden of laying the proper foundation for the admission of expert opinion testimony rests with the party offering that testimony. McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002).   The admissibility of the expert must be established by a preponderance of the evidence.  Id.

II.  Robert Lowry's Expert Opinions

Defendants seek to exclude the Expert Report of Robert W. Lowry (Doc. 40-2 ("Oct. Lowry Report")) dated October 1, 2010, and his Supplemental Expert Report (Doc. 40-3 ("Dec. Lowry Report"), dated December 23, 2010.  In his October Report, Lowry offers three opinions: (1) "that the call centers [operated by Big Apple] created the buying demand for CyberKey [] stock"; (2) "that a broker dealer is required to investigate red flags, and has a duty of providing fair and balanced information to the public"; and (3) "that Big Apple [] and MJMM [] were directly involved with issuing press releases, discussing the press releases with incoming callers and contacting Series 7 brokers without conducting reasonable due diligence concerning the information contained in the press releases."  In addition to these opinions, Lowry provided summary charts detailing transactions in CyberKey stock from July 5, 2005, through March 20, 2005.  (Apps. C & D to Oct. Lowry Report; App. D-1 to Dec. Lowry Report).

Although Defendants do not object to the SEC proffering Lowry as a summary witness, they do object to admission of his expert opinions.  Defendants first argue that

Lowry is not qualified, (Defs.' Mot. in Limine, Doc. 40, at 9), and that even if he is, his opinions should be excluded because they will not help the trier of fact and constitute legal conclusions, (id. at 10).

A.  Whether Lowry is Qualified

"[E]xperts may be qualified in various ways" including by "'knowledge, skill, experience, training, or education.'"  Frazier, 387 F.3d at 1260 (quoting Fed. R. Evid. 702) (emphasis removed).  Furthermore, a "nonscientific expert" may be qualified based on his "personal knowledge or experience" without the necessity of establishing "'[s]tandards of scientific reliability, such as testability and peer review.'"  Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC, 555 F.3d 1331, 1338 (11th Cir. 2009) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 151 (1999)).

Lowry has more than thirty-five years of experience in the securities industry, including twenty-three years with the SEC in the Division of Market Regulation.  While at the SEC, Lowry conducted numerous broker dealer examinations and self regulatory oversight inspections.  Additionally, Lowry has been qualified as an expert in other federal courts on markups and on securities trading in the over-the-counter market; he has provided counsulting services on broker dealer matters; and he has published articles addressing the subjects of "supervision and best execution" of broker dealer matters.  (Oct. Lowry Report at 2-3).

Defendants do not dispute Lowry's qualification as a broker dealer expert, but they argue that his experience is insufficient to qualify him as an expert on "investor relations firms."  Defendants' argument is without merit.  As the SEC points out, the allegations

against Defendants hinge on whether MJMM and Big Apple were functioning as broker dealers, and Lowry is–as admitted by Defendants–qualified to render opinions regarding the practices of broker dealers.  Furthermore, Lowry's experience qualifies him as an expert in securities trading in over-the-counter markets, and such trading is tied inextricably to Defendants' IR/PR services.

B.  Admissibility of Lowry's Opinions

Defendants also argue that even if Lowry is qualified, each of his opinions should be excluded because they are not helpful to the trier of fact and constitute legal conclusions. Defendants' arguments are again without merit.

In order for an expert opinion to assist the trier of fact, it must "concern[] matters that are beyond the understanding of the average lay person." Frazier, 387 F.3d at 1262.  Expert opinions that "offer nothing more than what lawyers for the parties can argue in closing arguments" generally do not assist the trier of fact.  Similarly, expert opinions that are "'imprecise and unspecific'" and those with a "factual basis [that] is not adequately explained" could easily confuse a jury and therefore also do not assist the trier of fact.  Cook v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1111 (11th Cir. 2005) (quoting Frazier, 387 F.3d at 1266). Although an expert opinion is not objectionable merely because "it embraces an ultimate issue to be decided by the trier of fact," Fed. R. Evid. 704(a), "[a]n expert witness may not testify as to his opinion regarding ultimate legal conclusions." United States v. Long, 300 F. App'x 804, 814 (11th Cir. 2008) (citing Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990)).

i.  Opinion 1: The Big Apple Call Centers Created the Buying Demand for CyberKey Stock

Defendants argue that Lowry's opinion that the call centers "created the buying demand for CyberKey [] common stock" is merely a factual determination that the trier of fact would be "fully capable of making . . . without expert assistance" and therefore is not helpful. Defendants also argue that this opinion is "actually a *sub rosa* legal conclusion" that "intrudes on the Court's role in instructing the jury on the law."  (Defs.' Mot. in Limine at 12).

"[I]n securities cases, expert testimony commonly is admitted to assist the trier of fact in understanding trading patterns, securities industry practice, securities industry regulations, and complicated terms and concepts."  SEC v Johnson, 525 F. Supp. 2d 70, 77 (D.D.C. 2007) (citing cases).  Lowry's opinion is based on his analysis of brokerage account statements, transfer agent records, records of the National Securities Clearing Corporation, and the Price/Volume Bloomberg Report for CyberKey in light of his thirty-five years of experience in the securities industry.  The ability to understand and synthesize such records is beyond the understanding of the average lay person and Lowry's analysis is helpful to the trier of fact.  See SEC v. U.S. Envtl., Inc., No. 94Civ.6608(PKL)(AJP), 2002 WL 31323832, at *3 (S.D.N.Y. Oct. 16, 2002) (finding a similar analysis admissible because it helped explain and synthesize complicated indirect evidence).

Furthermore, this opinion does not offer any legal conclusions.  Defendants contend that the inference that can be drawn from Lowry's opinion–that because Big Apple created the buying demand for CyberKey stock, it must have been acting as a broker dealer–is an impermissible legal conclusion.  This argument fails.  Lowry is not testifying about "the legal

implications of conduct," nor is he "tell[ing] the jury what result to reach." <u>Montgomery</u>, 898 F.2d at1541.  The trier of fact is free to draw its own inferences from Lowry's testimony. Accordingly, Lowry's first opinion is admissible.

<u>Opinion 2: A Broker Dealer is Required to Investigate Red Flags and Has a Duty of Providing Fair and Balanced Information to the Public</u>

Defendants assert that Lowry's opinion that a broker dealer is required to investigate "red flags" and has a duty of providing fair and balanced information to the public is also an legal conclusion.  Defendants argument is well-taken.  In this opinion, Lowry goes beyond describing the standard practices of broker dealers, and instead opines as to the legal duties of brokers and dealers.  Such an opinion usurps the Court's role in instructing the jury and is inadmissible.  <u>Montgomery</u>, 898 F.2d at 1541 ("[T]he court must be the jury's only source of law.").

<u>Opinion 3: Big Apple and MJMM Were Directly Involved with Issuing Press Releases, Discussing the Press Releases with Incoming Callers and Contacting Series 7 Brokers Without Conducting Reasonable Due Diligence Concerning the Information Contained in the Press Releases</u>

Finally, Defendants argue that Lowry's opinion that Big Apple and MJMM were directly involved with CyberKey's press releases without conducting reasonable due diligence concerning the information contained in those releases is inadmissible.  Defendants assert that the first part of the opinion–that Big Apple and MJMM were directly involved with issuing press releases–is not helpful and that the second part of the opinion–that Big Apple and MJMM did not conduct reasonable due diligence–contains a legal conclusion.  Defendants' interpretation of Lowry's opinion, however, does not make sense when the opinion is read as a whole.  The first part of Lowry's opinion is simply providing the necessary factual basis

for the second part.  Moreover, the second part of Lowry's opinion is not a legal conclusion; it is Lowry's opinion of what is reasonable based on his experience in the securities industry. Accordingly, Lowry's third opinion is also admissible.

## II.  Carl N. Duncan's Expert Opinions

The SEC seeks to exclude the Expert Report of Carl N. Duncan filed November 3, 2010 (Ex. A to Pl.'s Mot. in Limine, Doc. 36).  In his report, Duncan provides three opinions: (1) that Big Apple was not acting as a broker dealer; (2) that Big Apple's acquisitions were exempt under the Securities Act; and (3) that because Big Apple was not a broker dealer, it is subject to a lower standard of care.  None of these is an admissible opinion.[5]

Duncan's opinions are inadmissible because they are legal conclusions.  Whether Defendants are liable under § 15 turns on the issue of whether Defendants were broker dealers. Similarly, whether Defendants are liable under § 5 turns on whether Defendants were required to comply with the registration requirements provided in § 5 of the Securities Act.  Therefore, Duncan's opinion that Defendants were not broker dealers and his opinion that Defendants were exempt from the § 5 registration requirements are legal opinions that Defendants are not liable under § 15 or under § 5.  These opinions are not helpful to the jury because they "merely tell the jury what result to reach" and, accordingly, shall be excluded.[6]

_____

[5] The SEC also argues that Duncan is not qualified and that he used an unreliable methodology.  Because Duncan's opinions are not helpful to the trier of fact, these arguments need not be addressed; however, it is relevant to note that Duncan–as an experienced securities lawyer–is only qualified to opine as to the legal aspects of securities trading, not as to the general practices of brokers and dealers or IR/PR firms.

[6] Defendants rely heavily on SEC v. Sky Way Global, LLC, No. 8:09–cv–455–T–23TBM, 2010 WL 5058509 (M.D. Fla. Dec. 6, 2010) in arguing that

Montgomery, 898 F.2d at 1541.  Finally, Duncan's third opinion regarding the proper legal standard that should be applied in this case usurps the Court's role in instructing the jury and is inadmissible.  Id. ("[T]he court must be the jury's only source of law.").

## Summary Judgment

The SEC has moved for summary judgment on its § 5, § 15(a), and § 20(e) claims. As discussed in the following analysis, the SEC's motion must be granted.

I.  Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.  56(a).  When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations."  Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).  However, the failure to respond and create a factual dispute by the nonmoving party "does not automatically authorize the entry of summary judgment for the moving party."  Dixie Stevedores, Inc. v. Marinic Maritime, Ltd., 778 F.2d 670, 673 (11th Cir. 1985).

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  "[A]t the summary judgment

─────────────────────

Duncan's testimony is admissible.  However, the expert testimony in Sky Way was only admissible "to the extent that [it] . . . assist[ed] the trier of fact."  Id. at *4.  As discussed in the text, Duncan's opinions do not assist the trier of fact, and therefore they are inadmissible.

stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. Some degree of factual dispute is expected, but to successfully counter a motion for summary judgment the factual dispute must be material and genuine. That is, the factual evidence must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

II.  Section 5 Claims

The SEC alleges that Defendants Big Apple, MJMM, M. Jablon, and Maguire violated § 5(a)[7] and § 5(c)[8] of the Securities Act by selling unregistered shares of CyberKey stock. "Sections 5(a) and (c) . . . make it unlawful to offer or sell a security in interstate commerce if a registration statement has not been filed as to that security, unless the transaction qualifies for an exemption from registration." SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1085 (9th Cir. 2010).

"In order to establish a prima facie case for a violation of § 5 of the Securities Act, the SEC must demonstrate that (1) the defendant directly or indirectly sold or offered to sell

---

[7] Section 5(a) provides: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly . . . to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security . . . [or] to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

[8] Section 5(c) provides, in part: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy . . . any security, unless a registration statement has been filed as to such security."

securities; (2) through the use of interstate transportation or communication and the mails; (3) when no registration statement was in effect."  SEC v. Calvo, 378 F.3d 1211, 1214-15 (11th Cir. 2004) (citations omitted).  Notably, "[s]cienter is not a consideration" in the § 5 analysis, id.; § 5 "imposes strict liability on offerors and sellers of unregistered securities," Swenson v. Engelstad, 626 F.2d 421, 424 (5th Cir. 1980).  If the prima facie case is satisfied, the burden shifts to the defendants to prove that an exemption applies.  Berckeley Inv. Grp. LTD v. Colkitt, 455 F.3d 195, 212 (3d Cir. 2006) (citing SEC v. Ralston Purina Co., 346 U.S. 119, 126 (1953)).

There are two ways to establish an exemption from the § 5 registration requirements. First, pursuant to § 4(1), 15 U.S.C. § 77d(1), the § 5 registration requirements do not apply to "transactions by any person other than an issuer, underwriter, or dealer."  15 U.S.C. § 77d(1).  Therefore, if a defendant can establish that he was not an issuer, underwriter, or dealer, the transaction is exempt.  However, the § 4(1) exemptions are narrowly construed. Platforms Wireless Int'l Corp., 617 F.3d at 1086.  Second, if a defendant would otherwise be considered an underwriter, he may still be exempt under Rule 144, 17 C.F.R. § 230.144, which provides a "safe harbor" from the registration requirements of § 5.

Defendants do not contest that the SEC has established a prima facie case for its  § 5 claims, nor do they assert that they are exempt under Rule 144's safe harbor.  However, Defendants do assert that they qualify for an exemption under § 4(1).  The SEC concedes that Defendants were not "issuers," but it asserts that Defendants were both "underwriters" and "dealers."  The SEC's arguments are well-taken.

An "underwriter" is defined as including "any person who has purchased from an

issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security" 15 U.S.C. § 77b(11).  The SEC asserts that Defendants are underwriters because they obtained CyberKey stock with a view to distribution.  "The determination of whether securities were brought with a 'view to distribution' . . . pinions in large part on whether the securities 'come to rest in the hands of the security holder,'" which depends on "the amount of time the security holder retained the security before transferring it."  SEC v. Rosen, No. 01-0369-CIV, 2002 WL 34421029, at *6 (S.D. Fla. Feb. 22, 2002) (quoting Ackerberg v. Johnson, 892 F.2d 1328, 1336 (8th Cir. 1989)).  "Many courts have accepted a two-year rule of thumb to determine whether the securities have come to rest."  Ackerberg, 892 F.2d 1328; see also Berckeley, 455 F.3d at 213 ("Over time, courts have developed the general presumption that a two-year holding period is sufficient to negate the inference that the security holder [took] the securities with a 'view to distribute.'"); SEC v. Olins, No. C-07-6423 MMC, 2010 WL 900518, at *2 (N.D. Cal. Mar. 12, 2010) (citing cases).

Defendants do not assert that they held the CyberKey stock at issue for two or more years.  Instead, Defendants argue that the two-year rule is "outdated" and that the new rule of thumb should be only six months, or one year at a maximum.  Defendants cite to the amendments to Rule 144 for support.  Prior to 1997, the required holding period under Rule 144 was either two or three years, depending on other factors.  Revision of Holding Period Requirements in Rules 144 and 145, 62 Fed. Reg. 9242-01, 9242 (Feb. 28, 1997).   In the 1997 amendment, all required holding periods were reduced to one year.  Id.  Subsequently, effective in 2008, the holding period for restricted securities of issuers that are subject to certain reporting requirements was reduced to six months.  Revisions to Rules 144 and 145,

-14-

72 Fed. Reg. 71546-01, 71546 (Dec. 17, 2007).

Although Defendants concede that they do not qualify for the Rule 144 safe harbor, they argue that the rationale behind the Rule 144 holding period amendments applies to the § 4(1) exemption analysis.  Indeed, the purpose of the Rule 144 amendments was to "reduce the cost of capital" without "diminish[ing] investor protection."  62 Fed. Reg. 9242-01 at 9242; 72 Fed. Reg. 71546-01 at 71546.  What Defendants fail to acknowledge, however, is that the other requirements of Rule 144 provide significant safeguards for investors, and therefore the longer holding period is unnecessary.  For example, to qualify for the Rule 144 safe harbor, "adequate current public information with respect to the issuer of the securities must be available," and the amount of securities and manner of sale are regulated.  17 C.F.R. § 230.144(c), (e), (f).  The § 4(1) exemption does not provide such safeguards.[9]

The record reflects that Defendants' intention was to sell CyberKey stock as quickly as necessary to pay for the operating expenses of MJMM and Big Apple–not to invest in CyberKey.  (Maguire Dep. at 30, 38).  In order to pay these expenses, Defendants sold stock on a daily basis, and although the stocks sold may not have included CyberKey stock every

---

[9] Defendants also rely heavily on an unpublished decision from the District of Arizona, SEC v. iBiz Technology Corp., No. CV 06-502-PHX-JAT, 2008 WL 2852365 (D. Ariz. July 21, 2008).  In iBiz, the court admitted that the case presented a "close call" but ultimately determined that there was a genuine issue of material fact as to whether the defendant was an underwriter because there was evidence that the defendant only sold a small portion of the available shares in an "isolated and spread out" manner.  Id. at *5.  Along with being factually distinguishable, as the instant case involves daily sales of large portions of the available shares, the iBiz court did not mention the two-year rule and apparently did not give much consideration to the time the defendant held the stocks at issue.  Because the iBiz decision disregards the importance of holding time in the underwriter analysis, it is inconsistent with the majority approach, and this Court respectfully disagrees.

day, CyberKey stock was certainly sold on a regular basis.  (Id.; see also Apps. C & D to Oct.

Lowry Report; App. D-1 to Dec. Lowry Report).  Defendants may have held some CyberKey

stock for up to one year, but most was only held for a few weeks or months.[10]  (M. Jablon

Dec. 1 Dep. at 145; Kaley Dep., Dec. 6, 2010, ("Kaley Dec. 6 Dep."), Ex. 2 to Doc. 39, at

201).  This time period falls woefully short of the two-year rule of thumb, and Defendants

have failed to present any other evidence of their investment intention.  On the contrary, the

record shows that Defendants gave no consideration to how long they held the stocks, and

they were only concerned with selling enough stock to pay their bills.  Accordingly,

Defendants qualify as underwriters and were not exempt from the § 5 registration

requirements.

Moreover, even if Defendants did not qualify as underwriters, as addressed in section

III. B below they qualified as dealers.

III.  Section 15(a) Claims

The SEC alleges that Defendants Big Apple and MJMM violated § 15(a) of the

Exchange Act by acting as both brokers and dealers without registering as such.  Section

15(a) requires brokers and dealers–as defined by the statute–to register with the SEC prior

to using the mails or any other instrumentality of interstate commerce to effect any

transaction in the purchase or sale of a security.  15 U.S.C. § 78o(a)(1).  Although there is

_____

[10] Although Defendants also assert that there is some CyberKey stock that they have
not been able to sell, this does not reflect an intention to hold the stock for a long period of
time.  The record indicates that the only reason Defendants still hold such stock is because
there is no market for it.  (See M. Jablon Aff. ¶ 20 and Maguire Dep. at 30-34 (discussing
trading strategy)).

a genuine issue of material fact regarding whether Big Apple and MJMM were brokers, there

is no such issue regarding whether they were dealers.

A.  Whether Big Apple and MJMM Were Brokers

For purposes of § 15(a) liability, a "broker" is defined as "any person engaged in the

business of effecting transactions in securities for the account of others."   15 U.S.C. §

78c(4)(A).   In determining whether a person has acted as a broker, many factors are

considered, including whether the person

> 1) actively solicited investors; 2) advised investors as to the merits of an
> investment; 3) acted with a certain regularity of participation in securities
> transactions; [] 4) received commissions or transaction-based remuneration[;]
> 5) is an employee of the issuer; 6) is selling, or previously sold, the securities
> of other issuers; 7) is involved in negotiations between the issuer and the
> investor; 8) analyzes the financial needs of an issue; 9) recommends or
> designs financing methods; 10) discusses the details of securities transactions;
> and 11) makes investment recommendations.

SEC v. U.S. Pension Trust Corp., No. 07–22570–CIV, 2010 WL 3894082, at * 21 (S.D. Fla.

Sept. 30, 2010) (quotations and citations omitted).

The record contains conflicting evidence as to these factors.  Defendants claim that

they never directly solicited investors and that they only contacted registered brokers to

make the brokers aware of their clients' stock, (Maguire Dep. at 44; M. Jablon Aff. ¶ 15), and

that while communicating with those brokers Big Apple and MJMM only offered publically

available information–not opinions on the merits of the investment.  (M. Jablon Dec. 1 Dep.

at 34-37).  While there is evidence to support this contention, other evidence suggests that

a goal of contacting the brokers was to entice the brokers themselves to invest in their

clients' stock.  (M. Jablon Dec. 1 Dep. at 24).

Moreover, the record contains conflicting evidence as to whether the call room employees received transaction-based remuneration.  Big Apple and MJMM argue that the call room employees merely received motivational incentives that were of nominal value–such as movie tickets–and that these so-called "spiffs" were based on factors including attitude and attendance, with effectiveness being only one of the factors.  (M. Jablon Aff. ¶ 13).  Call room employees stated that they would indeed get nominal "spiffs" for things like attendance and attitude–approximately twenty-five dollars per week–however, their compensation for effectiveness was much greater.  (Andrea Cox Dep., Ex. 7 to Doc. 39, at 22-25; Dale Scott Dep., Ex. 8 to Doc. 39, at 19-22).  According to the call room employees, "effectiveness" was determined by how many shares were purchased as a result of that employee's contact with the brokers, (Cox Dep. at 23-24; Scott Dep. at 20-21), and that the "spiffs" for high effectiveness ranged from $50 to $1000 per week or were sometimes expensive items such as video game consoles or a vacation.  (Cox Dep. at 23; Scott Dep. at 20-21; Cox SEC Hearing Testimony, Ex. C to Doc. 54, at 38-42).

Due to this conflicting evidence regarding key issues, there is a genuine issue of material fact as to whether Defendants functioned as brokers.

B.  Whether Defendants Were Dealers

The Exchange Act defines "dealer" as "any person engaged in the business of buying and selling securities for such person's own account through a broker or otherwise," but specifically excludes from the definition "a person that buys or sells securities for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business."  15 U.S.C. § 78c(a)(5).  This definition "connote[s] a certain regularity of

participation in securities transactions at key points in the chain of distribution." <u>Mass. Fin. Servs., Inc. v. Sec. Investor Prot. Corp.</u>, 411 F. Supp. 411, 415 (D. Mass. 1976); <u>see also</u> <u>SEC v. Ridenour</u>, 913 F.2d 515, 517 (8th Cir. 1990) (finding that the defendant was a dealer because his high "level of [trading] activity . . . made him more than an active investor"). "[T]he primary indicia in determining that a person has 'engaged in the business' within the meaning of the term 'dealer' is that the level of participation in purchasing and selling securities involves more than a few isolated transactions.  There is no requirement, however, that such activity be a person's principal business or the principal source of income." <u>In re Gordon Wesley Sodorff, Jr.</u>, 50 S.E.C. 1249, at * 4 (1992).  Furthermore, the SEC has promulgated guidelines to help determine whether someone is acting as a dealer or not. These guidelines provide, among other things, that a business may need to register as a dealer if it "holds [itself] out as being willing to buy and sell a particular security on a continuous basis."  (SEC, Guide to Broker-Dealer Registration, Ex. V to Doc. 54, at 5).

It is undisputed that Big Apple and MJMM received most of their compensation by obtaining and selling their clients' stocks, which they did on a daily basis.  This goes well beyond a few isolated transactions, and even though selling stocks for their own account was not Big Apple's nor MJMM's principal business, it was their principal source of income. Additionally, Big Apple and MJMM undoubtedly held themselves out as being willing to buy and sell CyberKey stock on a regular basis.  Accordingly, Big Apple and MJMM were "dealers" as defined by the Exchange Act and violated the Act by failing to register as such.

IV.  Section 20(e) Claims

The SEC alleges that Defendants M. Jablon, Kaley, and Maguire ("Individual

Defendants") aided and abetted Big Apple and MJMM's violation of § 15(a) pursuant to § 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).  Aider and abettor liability is established "'if some other party has committed a securities law violation, if the accused party has general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation.'"  Woods v. Barnett Bank of Ft. Lauderdale, 765 F.2d 1004, 1009 (11th Cir. 1985) (quoting Woodward v. Metro Bank of Dallas, 522 F.2d 84, 94-95 (5th Cir. 1975)).  In determining whether a defendant has a "general awareness," "the surrounding circumstances and expectations of the parties [are] critical" and knowledge "c[an] be shown by circumstantial evidence, or by reckless conduct." Id. at 1010.  Furthermore, "[t]he rule in this circuit is that 'severe recklessness' satisfies the scienter requirement." Id.  The Eleventh Circuit has limited "severe recklessness" to "highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." Id. (quoting Broad v. Rockwell Int'l Corp., 642 F.2d 929, 961 (5th Cir. 1981).[11]

Individual Defendants argue that only actual knowledge, not severe recklessness, satisfies the scienter requirement.  Individual Defendants note that the trend "in recent years" is for courts to require actual knowledge, not just recklessness, and they cite several cases supporting such a contention.  However, none of these cases is from the Eleventh Circuit, and Defendants have provided no authority that would enable this Court to disregard the

_____

[11] As noted in Woods, the Eleventh Circuit's "definition of severe recklessness is identical to that used by other courts to describe what conduct they considered reckless." 765 F.2d at 1010 n.9.

binding precedent set forth in <u>Woods</u> and subsequent cases.  Furthermore, even if there had been a trend toward requiring actual knowledge, Congress has put an end to such a trend by amending the Exchange Act to specifically include "recklessness."[12]  15 U.S.C. § 78t(e) (2010).

The record indicates that all three Individual Defendants were at least severely reckless in providing substantial assistance to Big Apple's and MJMM's § 15(a) violations. As discussed previously, Big Apple and MJMM functioned as dealers of CyberKey stock because the buying and selling of CyberKey stock for their own accounts was a part of their regular business.  All three Individual Defendants were intimately involved with the decisions to buy and sell CyberKey stock.  M. Jablon and Kaley determined when to purchase CyberKey stock, (Kaley Dep. at 94; Maguire Dep. at 28), and Maguire determined when to sell that stock based on the operation budget needs provided by M. Jablon, (Maguire Dep. at 28-29, 41).  In addition, Maguire negotiated with CyberKey to create the compensation scheme whereby Big Apple and MJMM would receive and sell CyberKey stock, and that scheme was approved by both Maguire and Kaley (Kaley SEC Hearing Testimony, Ex. 11 to Doc. 39, at 40).  Such intimate knowledge and control over the buying and selling of CyberKey stock on behalf of Big Apple and MJMM constitutes aiding and abetting of Big Apple's and MJMM's violations of § 15(a).

### Conclusion

---

[12] Because severe recklessness has always been sufficient to establish aider and abettor liability in the Eleventh Circuit, the Court need not address whether the recent amendments to the Exchange Act apply retroactively or not.

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** that:

1.  The SEC's Motion for Partial Summary Judgment (Doc. 62) is **GRANTED**;

2.  The SEC's Motion in Limine (Doc. 36) is **GRANTED**; and

3.  Defendants' Motion in Limine (Doc. 40) is **GRANTED** in part and **DENIED**

in part as set forth herein.

**DONE** and **ORDERED** in Chambers, Orlando, Florida this 25th day of August, 2011.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party