# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**U.S. SECURITIES AND EXCHANGE COMMISSION,**

       **Plaintiff,**

**-vs-**                          **Case No. 6:09-cv-1963-Orl-28GJK**

**BIG APPLE CONSULTING USA, INC., MJMM INVESTMENTS, LLC, MARC JABLON, MATTHEW MAGUIRE, MARK C. KALEY, and KEITH JABLON,**

       **Defendants.**

_____

## ORDER

The Securities and Exchange Commission ("the SEC") brought this enforcement action against Defendants, alleging that Defendants violated the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. § 77a et seq., and the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78a et seq. A jury trial was held in January 2012, at the conclusion of which the jury returned a verdict in favor of the SEC on all claims. Currently before the Court are Defendants' motions for judgment as a matter of law and alternative motions for a new trial.[1] As discussed below, Defendants' motions shall be denied.

---

[1]This case is currently before the Court on the Ore Tenus Motions for Judgment as a Matter of Law raised at the conclusion of the SEC's case (Doc. 132) and at the conclusion of the presentation of evidence (Doc. 137); Kaley's (*Pro Se*) Motion for Directed Verdict and Judgment as a Matter of Law (Doc. 145), the SEC's Response (Doc. 170), and Kaley's Reply (Doc. 173); K. Jablon's (*Pro Se*) Motion to Have Jury Verdict Overturned (Doc. 146) and Memorandum in Support (Doc. 147), the SEC's Response (Doc. 169), and K. Jablon's Reply (Doc. 175); and the Motion for Judgment as a Matter of Law filed by Big Apple, MJMM, and

**I.  Legal Standards**

   **A.  Judgment as a Matter of Law**

Federal Rule of Civil Procedure 50 governs motions for judgment as a matter of law. Such a motion may be granted against a party "[i]f a party has been fully heard on an issue and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a).  Entry of judgment as a matter of law is appropriate "only if 'the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict.'" Action Marine, Inc. v. Cont'l Carbon Inc., 481 F.3d 1302, 1309 (11th Cir. 2007) (quoting Flury v. Daimler Chrysler Corp., 427 F.3d 939, 945 n.12 (11th Cir. 2005)).  A court reviews all evidence in the record and must draw all reasonable inferences in favor of the nonmoving party; however, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000)). Additionally, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." Id. at 150-51.

   **B.  Motion for a New Trial**

Pursuant to Federal Rule of Civil Procedure 59, a trial judge "may, on motion, grant a new trial on all or some of the issues—and to any party . . . after a jury trial, for any reason

---

M. Jablon (Doc. 149) and the SEC's Response (Doc. 171).  Maguire and Kaley have also adopted the Motion for Judgment as a Matter of Law filed by Big Apple, MJMM, and M. Jablon (Doc. 149).  (Docs. 150 & 151).

for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). While a less stringent standard applies to a motion for new trial than to a motion for judgment as a matter of law, Dudley v. Wal-Mart Stores, Inc., 166 F.3d 1317, 1320 n.3 (11th Cir. 1999), "a judgment should not be set aside merely because the losing party can probably present a better case on another trial," George v. GTE Directories Corp., 195 F.R.D. 696, 701 (M.D. Fla. 2000) (quotation omitted). Rather, "[w]hen ruling on a motion for a new trial, a trial judge must determine if in his opinion, the verdict is against the clear weight of the evidence . . . or will result in a miscarriage of justice." Ins. Co. of N. Am. v. Valente, 933 F.2d 921, 923 (11th Cir. 1991) (citations and quotations omitted). Additionally, "new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." Id.

**II. Background**

MJMM Investments, LLC ("MJMM") is a wholly owned subsidiary of Big Apple Consulting USA, Inc. ("Big Apple"), and both companies were involved in providing investor relations and public relations ("IR/PR") services to microcap companies. During the relevant time period, both companies were controlled by the individual Defendants.[2] The SEC's allegations stem from Defendants' relationship with non-party CyberKey Solutions, Inc. ("CyberKey") and its CEO James Plant ("Plant"). CyberKey sold, among other things, secure

---

[2] Marc Jablon ("M. Jablon") was the president and CEO of Big Apple and co-founded MJMM with Defendant Matthew Maguire ("Maguire"); Maguire was the vice president of Big Apple; Mark Kaley ("Kaley") was president of MJMM and an officer of Big Apple; K. Jablon was vice president of Management Solutions International, Inc. ("MSI")–another Big Apple subsidiary that was involved in providing IR/PR services to CyberKey.

-3-

USB flash drives. CyberKey entered into an agreement with MJMM pursuant to which Big Apple and its subsidiaries would provide CyberKey with IR/PR services. Subsequently, it came to light that CyberKey and Plant had fraudulently reported a $24.49 million contract with the Department of Homeland Security ("DHS") that did not exist ("the DHS contract").

In its original Complaint (Doc. 1), the SEC alleged violations of § 17(a) of the Securities Act and § 10(b) of the Exchange Act and Rule 10b-5 thereunder against all Defendants; violations of § 5(a) and § 5(c) of the Securities Act against Big Apple, MJMM, M. Jablon, and Maguire; violations of § 15(a) of the Exchange Act against Big Apple and MJMM; and violations of § 20(e) of the Exchange Act for aiding and abetting Big Apple's and MJMM's violations of § 15(a) against M. Jablon, Maguire, and Kaley.

This Court granted partial summary judgment to the SEC on its § 5 and § 15 claims and on the claims that M. Jablon, Maguire, and Kaley aided and abetted Big Apple's and MJMM's violations of § 15(a). (Doc. 91). The case was then set for trial to determine the remaining claims. Prior to trial, however, the Supreme Court decided Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296 (2011), wherein it determined that in order for a party to incur primary liability in a private action under Rule 10b-5 for making false statements, the party must be "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate [the statement]." Id. at 2302. Based on this ruling, the SEC sought and was granted leave to amend its complaint, (Doc. 92); specifically, the SEC withdrew its primary liability claims under § 10(b) and Rule 10b-5, and it added claims that Defendants violated § 20(e) of the Exchange Act by aiding and abetting CyberKey's and Plant's violations of § 10(b) and Rule 10b-5, (Am.

Compl., Doc. 93).

In opposing the SEC's motion to amend, Defendants asserted, inter alia, that amendment would be futile and that the § 17(a) claims should be dismissed along with the § 10(b) and Rule 10b-5 claims. Defendants' futility argument was based on the assertion that "severe recklessness" was insufficient to establish aider and abettor liability under § 20(e); this argument was rejected in the partial summary judgment Order (Doc. 91), and that rejection was adopted in the Order granting the SEC leave to amend (Doc. 92). Thereafter, Defendants filed a motion to reconsider both of those Orders (Doc. 102), and in the Order denying Defendants' motion to reconsider (Doc. 121), the Court more thoroughly explained its reasons for rejecting Defendants' argument as to the severe recklessness standard. (Id. at 7-10).[3]

The Court also summarily denied Defendants' cross-motion to dismiss the § 17(a) primary liability claims in its Order granting the SEC leave to amend (Doc. 92) and more thoroughly explained its reasoning in its reconsideration Order (Doc. 121). In their cross-motion to dismiss, Defendants asserted that the Janus decision applied not only to § 10(b) and Rule 10b-5 but also to § 17(a). Defendants argued that the SEC's concession that, due to the Janus decision, it could not bring § 10(b) and Rule 10b-5 primary liability claims against Defendants was also a concession that the SEC could not bring § 17(a) primary liability claims against Defendants. As explained in the reconsideration Order, however, the analysis in Janus closely focused on the "to make" language contained in Rule 10b-5 and

---

[3]The Court also rejected Defendants' futility argument because, in addition to alleging severe recklessness, the SEC also alleged that Defendants acted knowingly.

emphasized the difference between private actions and those brought by the SEC. (Doc. 121 at 14). After contrasting the differences between the language of § 17(a) and the "to make" language of Rule 10b-5 and noting that, unlike Janus, this case was brought by the SEC rather than a private party, this Court ultimately refused to extend the holding in Janus to the § 17(a) claims in this case. (Id. at 12-15).

Finally, this case proceeded to trial in January 2012, at the conclusion of which the jury returned a verdict in favor of the SEC on all claims. (Jury Verdict, Doc. 140). The verdict, however, was not the conclusion of this case; Defendants have moved for judgment as a matter of law or in the alternative for a new trial. Specifically, Defendants argue that the "deliberate ignorance" jury instruction–to which Defendants objected before it was given–was legally incorrect and prejudiced Defendants. Defendants also raise their previous legal arguments regarding the "severe recklessness" standard and the application of Janus to the § 17(a) claims, but Defendants acknowledge that those arguments have been rejected at least twice and that the Court restricted the scope of the parties' Rule 50 arguments to the issue regarding the deliberate ignorance instruction. (Doc. 149 at 2). Accordingly, the Court will only address arguments regarding the deliberate ignorance instruction.[4]

---

[4] Several of the pro se Defendants also argued that the evidence was insufficient to support the jury's verdict–specifically arguing that there was insufficient evidence as to the scienter requirements. As noted in the text, however, the parties were specifically limited to addressing the deliberate ignorance instruction. (See Mins., Doc. 139 ("Court allows Defendants to file a written Motion for Judgment as a Matter of Law (Rule 50) and brief regarding the deliberate ignorance instruction not to exceed 20 pages"); Doc. 149 at 2 (acknowledging that "the Court has restricted the scope of the [Rule 50 briefs] to the 'deliberate ignorance instruction.'")). Nevertheless, as demonstrated by the discussion in the text of the evidence presented to support a deliberate ignorance instruction, there was more than enough evidence for a reasonable jury to at least infer actual knowledge to each

**III. Discussion**

The "deliberate ignorance" instruction given to the jury in this case is as follows:

> [T]he SEC may prove a Defendant acted knowingly or recklessly by proving, by a preponderance of the evidence, that a Defendant deliberately closed his eyes to what would otherwise have been obvious to him. No one can avoid liability under the securities laws by deliberately ignoring what is obvious. You may infer knowledge of the existence of a fact if a Defendant was aware of a high probability of the existence of that fact and purposely contrived to avoid learning all the facts. If you find by a preponderance of the evidence that a Defendant intentionally avoided knowledge or enlightenment, you may find that Defendant acted knowingly or recklessly.

(Doc. 138 at 26, 36-37). Defendants argue that this instruction should not have been given because there was no evidence of a deliberate avoidance of knowledge by Defendants. Additionally, Defendants assert that even if giving a deliberate ignorance instruction was appropriate, the one that was given misstated the law because it did not focus on Defendants' subjective beliefs. As discussed below, Defendants' arguments are not well-taken.

**A. Propriety of Giving a Deliberate Ignorance Instruction**

The basic theory of deliberate ignorance[5] is that a defendant who "deliberately shield[s] [himself] from clear evidence of critical facts that are strongly suggested by the circumstances . . . [is] just as culpable as those who have actual knowledge." Global-Tech Appliances, 131 S. Ct. at 2062-63 (2011). There are two basic requirements for a finding

---

Defendant based on deliberate ignorance.

[5] The theory of deliberate ignorance is also called "willful blindness," see e.g., Global-Tech Appliances, Inc. v. SEB S.A., 131 S. Ct. 2060, 2070 (2011), and "conscious avoidance," see e.g., United States v. Kaiser, 609 F.3d 556, 565-66 (2d Cir. 2010).

of deliberate ignorance: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." Id. at 2070 (citing, inter alia, United States v. Perez-Tosta, 36 F.3d 1552, 1564 (11th Cir. 1994)). Although the theory of deliberate ignorance originated in criminal cases, the Supreme Court has recognized that such a theory also has a place in civil actions. See id. at 2069. Indeed, the rationale behind deliberate ignorance is equally applicable in civil actions–particularly civil enforcement actions by a government entity like the one here.

Nevertheless, a deliberate ignorance instruction is not appropriate in all cases where knowledge is required; it should only be given in cases where there has been evidence presented that "point[s] in the direction of deliberate ignorance." United States v. Adair, 951 F.2d 316, 319 (11th Cir. 1992) (quotation omitted). Such evidence may be direct or circumstantial. Id. On the other hand, "[a] district court should not instruct the jury on 'deliberate ignorance' when the relevant evidence points only to *actual knowledge*, rather than deliberate avoidance." Perez-Tosta, 36 F.3d at 1564-65 (emphasis in original).

Defendants assert that the SEC failed to produce any evidence that "pointed in the direction of deliberate ignorance."[6] This is clearly not the case. The SEC presented a

---

[6] Defendants also assert that giving a deliberate ignorance instruction effectively lowers the scienter requirement to negligence. Despite Defendants' assertions, they have not provided any support for the idea that giving this instruction lowers the scienter requirement across the board. To the contrary, every appellate court has recognized that deliberate ignorance is equivalent to actual knowledge when applied correctly. See Global-Tech Appliances, 131 S. Ct. at 2070 & n.9 (collecting cases). Indeed, the cases cited by Defendants in support of their negligence argument only found that there was a risk of the jury applying a negligence standard when the instruction was improperly given. United

-8-

substantial amount of evidence that a reasonable jury could have relied on to determine that Defendants were aware of a high probability that the contract with DHS was fraudulent and that Defendants deliberately avoided obtaining actual knowledge of this fact.

First, the SEC presented evidence that Defendants were aware that Plant continuously changed his story as to the details of the DHS contract–including the entity with which CyberKey was supposedly contracting.  (See Pl.'s Exs. 73-80).  In a string of emails between K. Jablon and Plant–on which M. Jablon was copied–the alleged contract changed from a $19 million purchase from the Military Post Exchange ("MPX"), (Pl.'s Ex. 74), to a $23.9 million purchase from MPX, (Pl.'s Ex. 79), and then, within a four-hour time period and without explanation, to a $23.9 million purchase from DHS, (Pl.'s Ex. 80).[7]  Additionally, the SEC presented evidence that the purported DHS contract, a copy of which Defendants were given by Plant, contained numerous inconsistencies that were obvious to anyone who looked at the contract.  (Pl.'s Ex. 95).  For example, the contract contained two different "contract award" dates–October 31, 2005 and August 12, 2005, (id. at 005898 & 005900)–and the contract price stated–$24,494,412.15–was different from either price Plant had provided for

---

States v. Delgado, 631 F.3d 685, 708-09 (5th Cir. 2011) (determining that because a deliberate ignorance instruction was given when there was a complete lack of evidence of deliberate ignorance, there was a "high risk of allowing the jury to erroneously convict [the defendant] based on a belief that she was merely negligent or reckless"); Kaiser, 609 F.3d at 566 (determining that because the deliberate ignorance instruction was legally incorrect, "[t]here [was] some risk that the jury could have convicted if it concluded that [the defendant] was merely negligent").

[7] The emails also indicate that Maguire edited the press releases containing the information about the contract, and such evidence could support a conclusion that he also knew of Plant's changing story.

the press releases, (id. at 005898). The contract also contained "Standard Bid and Contract Terms and Conditions" that indicated that the contract was with the State of Connecticut rather than DHS. (Id. at 005902 (defining "State" as "The State of Connecticut," repeatedly referencing "the State" as the entity with which the bidder is contracting, requiring that "[a]ll bids must be addressed to the State of Connecticut, Dept. of Information Technology, Contracts & Purchasing Division," and failing to reference any federal agency)).

In addition to these inconsistencies, the SEC presented evidence that Defendants questioned Plant's honesty and reliability in his business dealings with them. Many of these issues were captured in the "broken promises" memorandum, of which at least K. Jablon, M. Jablon, and Kaley were aware. (Pl.'s Ex. 92). Included in this memorandum was the fact that Plant was frequently promising to provide information–such as financial information for CyberKey–and then failing to do so, that he would claim to have set up meetings with clients but that those meetings would consistently get cancelled at the last minute, and that Plant would generally drag his feet and avoid answering questions. (Id.).

After presenting this background of inconsistencies and untrustworthiness, the SEC presented evidence that both the National Association of Securities Dealers ("NASD") and DHS itself inquired about the legitimacy of the DHS contract. (NASD Inquiry, Pl.'s Ex. 15; DHS Inquiry, Pl.'s Ex. 8; see also Jan. 10, 2012 Trial Tr., Doc. 177, at 59-60 (testimony of Kelson Monks explaining that he received the fax from DHS and sent it to Kaley); M. Jablon Dep.,[8] Ex. L to Doc. 171, at 132-34 (explaining that M. Jablon was informed of the fax by

---

[8] M. Jablon's December 3, 2010 video deposition was played during trial. (Jan. 11, 2012 Trial Tr., Doc. 178, at 2).

Kaley and saw it within 48 hours)). Then, the SEC presented evidence that, during this time period, M. Jablon, K. Jablon, and Kaley were so concerned about the validity of the DHS contract that they attempted to obtain copies of the cancelled checks supposedly issued to CyberKey from DHS or copies of CyberKey's bank statements. (K. Jablon Investigative Testimony,[9] Ex. I to Doc. 171, at 60-61). Despite these requests, however, Defendants never received copies of either, and K. Jablon testified that Plant's staff was purposefully evading the requests. (Id.). All of these circumstances taken together could certainly support a determination that Defendants were aware of a high probability that the DHS contract was fraudulent.

In addition to this evidence, the SEC also presented evidence that Defendants took deliberate actions to avoid learning the fact that the DHS contract was fraudulent. After receiving the NASD and DHS inquiries, Defendants did not review the copy of the DHS contract they had on file, (Kaley Dep.,[10] Ex. F to Doc. 171, at 141), they did not request a copy of the additional DHS contract mentioned in the DHS inquiry, (M. Jablon Dep. at 136), and they did not follow up with DHS, (id. at 137; Kaley Dep. at 151). Defendants were content to turn these issues over to Plant and, despite all of the reasons not to trust Plant, they assumed he would take care of them. (See M. Jablon Dep. at 135-36). The only apparent actions that Defendants took was to attempt to obtain copies of the cancelled

---

[9] K. Jablon's February 7, 2008 investigative testimony was read during trial. (Jan. 12, 2012 Trial Tr., Doc. 180, at 47).

[10] Kaley's December 7, 2010 video deposition was played during trial. (Jan. 12, 2012 Trial Tr. at 48).

-11-

checks or CyberKey's bank statements and, when such action failed, Defendants continued to ignore the situation.  (Id.; K. Jablon Investigative Testimony at 60-61).

Along with all of the above evidence, the SEC also presented evidence as to the motivation behind Defendants' deliberate ignorance.  Defendants were being paid in CyberKey stock.  When Defendants first began providing their services, CyberKey stock was not worth much, but after the press release regarding the DHS contract the price of CyberKey's stock soared.  (Jan. 13, 2012 Trial Tr., Doc. 181, at 76-78).  In fact, the SEC presented evidence that MJMM sold over 704 million shares of CyberKey stock for approximately $7.4 million, (id. at 26), and Big Apple sold over 16.5 million shares of CyberKey stock for about $375,000, (id. at 27).  Thus, the jury could have determined that Defendants had an incentive to turn a blind eye to the fraudulent actions of Plant and CyberKey in order to make a significantly larger profit.

Accordingly, the SEC presented sufficient evidence for the jury to determine that Defendants were aware of a high probability that the DHS contract was fraudulent and that they took deliberate actions to avoid learning that fact.  Therefore, instructing the jury on deliberate ignorance was proper.

### B.  Wording of the Instruction Given in this Case

Defendants next argue that even if giving a deliberate ignorance instruction was appropriate in this case, the wording of the instruction given was legally incorrect because it did not focus on Defendants' subjective beliefs.  In advancing this argument, however, Defendants do not analyze the deliberate ignorance instruction but rather a portion of the instructions pertaining to the severe recklessness standard.  The portion of the instruction

Defendants cite is as follows:

> A Defendant's claim that he acted in good faith, without more, does not preclude you from finding that he acted recklessly. Therefore, even if you find that a Defendant believed in the representations they made, you may still find the SEC has established the state of mind requirement of a Section 17(a)(1) claim if his belief was based upon nothing more than a severely reckless disregard of the truth. Moreover, in considering whether or not a Defendant acted in good faith, you are instructed that a belief by the Defendant, if such belief existed, that ultimately everything would work out so that no one would lose any money does not require you to find that he acted in good faith.

(Doc. 138 at 27). By only emphasizing a certain portion of this instruction, Defendants attempt to construe the instruction as saying that the jury can disregard Defendants' subjective beliefs when determining whether Defendants acted with knowledge or deliberate ignorance. (Doc. 149 at 15). This argument simply misconstrues the instruction. The above instruction clearly states that Defendants' erroneous subjective beliefs–if based on nothing more than a severely reckless disregard for the truth–does not preclude a finding that they acted *recklessly*. The instruction does not mention knowledge or deliberate ignorance.

On the other hand, the actual deliberate ignorance instruction satisfies the requirements for a deliberate ignorance instruction set forth by the Supreme Court: that "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." Global-Tech Appliances, 131 S. Ct. at 2070. The instruction given in this case states in part: "You may infer knowledge of the existence of a fact if a Defendant was aware of a high probability of the existence of that fact and purposely contrived to avoid learning all the facts." (Doc. 138 at 26). This language was taken directly from an Eleventh Circuit case–United States v. Rivera, 944 F.2d 1563, 1571 (11th Cir. 1991)–that states that a deliberate ignorance

instruction is warranted when "the facts . . . support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." The instruction tells the jury that it may only infer knowledge if Defendants were actually aware of the high probability; such an instruction does not leave room for the jury to disregard Defendants' subjective belief when applying the deliberate ignorance standard. Accordingly, the deliberate ignorance instruction given in this case was proper.

### C. New Trial

Finally, Defendants argue that they should be granted a new trial because they were prejudiced by the deliberate ignorance instruction. As discussed previously, however, the deliberate ignorance instruction was properly given. Moreover, even if the instruction had been given in error, any such error would have been harmless because a finding of severe recklessness is sufficient under § 17(a)(1) and § 20(e), and the jury determined that Defendants acted with both actual knowledge and severe recklessness. (Jury Verdict, Doc. 140). Accordingly, Defendants will not be granted a new trial.

### IV. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** that the Ore Tenus Motion for Judgment as a Matter of Law raised at the conclusion of the SEC's case (Doc. 132), the Ore Tenus Motion for Judgment as a Matter of Law raised the conclusion of the presentation of evidence (Doc. 137), Kaley's (Pro Se) Motion for Directed Verdict and Judgment as a Matter of Law (Doc. 145), K. Jablon's (Pro Se) Motion to have Jury Verdict Overturned (Doc. 146), and the Motion for Judgment as a Matter of Law filed by Big Apple,

MJMM, and M. Jablon (Doc. 149) are **DENIED**.  Once the remedies portion of this case is resolved, the Court will direct judgment to be entered.

**DONE** and **ORDERED** in Chambers, Orlando, Florida this 9th day of August, 2012.

_____
JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party