[PUBLISH]

## IN THE UNITED STATES COURT OF APPEALS

### FOR THE ELEVENTH CIRCUIT

_____

No. 13-11976

_____

D.C. Docket No. 6:09-cv-01963-JA-GJK

U.S. SECURITIES AND EXCHANGE COMMISSION,

Plaintiff - Appellee,

versus

BIG APPLE CONSULTING USA, INC.,
MJMM INVESTMENTS, LLC,
MARC JABLON,
MARK C. KALEY,

Defendants - Appellants,

MATTHEW MAGUIRE, et al.,

Defendants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(April 9, 2015)

Before CARNES, Chief Judge, TJOFLAT and SILER,* Circuit Judges.

SILER, Circuit Judge:

The Securities and Exchange Commission (SEC) brought this civil

enforcement action against defendants Big Apple Consulting USA, Inc. (Big

Apple), MJMM Investments, LLC (MJMM), Marc Jablon (Jablon), and Mark C.

Kaley (Kaley) (collectively, the defendants) for violations of the Securities Act of

1933 (Securities Act), 15 U.S.C. § 77a *et seq.*, and the Securities Exchange Act of

1934 (Exchange Act), 15 U.S.C. § 78a *et seq*.  The SEC also brought the action

against Matthew Maguire (Maguire) and Keith Jablon (Keith), but those

defendants are not involved in this appeal.  The district court granted summary

judgment in favor of the SEC as to some of the claims, and the remainder of the

claims proceeded to trial.  A jury found in favor of the SEC as to the remaining

claims against all defendants.

On appeal, the defendants assert six claims of error involving both the

district court's partial grant of summary judgment in favor of the SEC and the

district court's rulings in the jury trial.  For the reasons explained below, we affirm.

_____

* The Honorable. Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit,
sitting by designation.

## FACTUAL BACKGROUND

### a. The Players

Big Apple and its wholly owned subsidiary, MJMM, provided investor relations and public relations services to microcap companies.  Management Solutions International, Inc. (MSI), another wholly owned subsidiary of Big Apple, offered a variety of services, including marketing, business planning, and e-commerce website development and maintenance.  Jablon was president and CEO of Big Apple, as well as CEO of MSI.  Jablon and Maguire cofounded MJMM; Maguire also served as the vice president of Big Apple.  Kaley was president of MJMM and an officer of Big Apple.  Kaley was also an attorney.  Keith is Jablon's brother and was vice president of MSI.

The SEC's allegations stem from the defendants' relationship with CyberKey Solutions, Inc. (CyberKey), previously known as CyberKey Corp., and its CEO James Plant (Plant).  CyberKey sold customizable USB drives that could be loaded with encryption software to secure content stored on the drives. Beginning on July 5, 2005, CyberKey's stock traded on a website called Pink Sheets, which displays the bid and ask prices for over-the-counter securities (*i.e.,* securities that are not listed on a U.S. exchange).  On June 15, 2005, Kaley executed a consulting agreement with CyberKey on behalf of MJMM, in which MJMM agreed to provide services intended to promote CyberKey's business.

According to the agreement, MJMM would "diligently market and promote [CyberKey] to brokers . . . and [ ] introduce [CyberKey] and its principals to [MJMM's] current and future network of brokerage firms and market makers." Although CyberKey signed the agreement with MJMM, the parties understood that Big Apple and its subsidiaries would provide all the services detailed in the consulting agreement.

Under the terms of the original consulting agreement, CyberKey paid MJMM $50,000 per month either in cash or in "free-trading shares"[1] of CyberKey, which was calculated based on the previous ten-day average closing bid price. This sort of exchange was typical for Big Apple; at least ninety-five percent of Big Apple's clients paid in stock.  The consulting agreement between MJMM and CyberKey was extended twice—once on November 14, 2005 and again on October 9, 2006.  Kaley signed both agreements.  The October 2006 extension required CyberKey to pay $80,000 per month or a  number of CyberKey shares calculated based on a fifty percent discount of the ten-day average closing bid price of CyberKey stock.  Thus, assuming a constant closing bid price in CyberKey stock over the previous ten-day period, MJMM received CyberKey stock that had a market value of $160,000 in exchange for $80,000 worth of services.  During the

---

[1] "Free-trading shares" are not subject to restrictions such as a waiting period and can be readily sold in the market; however, the subsequent offer or sale of the shares is not necessarily exempt from registration requirements.  *See* 15 U.S.C. § 77e.

entire period that CyberKey contracted with MJMM, CyberKey paid exclusively in stock for services provided.  MJMM also negotiated the option to purchase additional CyberKey stock at a significant discount, initially forty percent in July 2006 and increasing to fifty percent shortly thereafter.  Ultimately, MJMM received approximately 77 million CyberKey shares for services rendered, and at the direction of Jablon and Kaley, MJMM purchased a total of approximately 648 million more shares by exercising options on a regular basis.

As part of its public relations services to CyberKey and other clients, Big Apple operated a telephone call room that contacted registered securities brokers and dealers to disseminate public information in order to create interest in client companies and their stock.  Maguire supervised the call room on a day-to-day basis, but Jablon bore ultimate oversight and was both aware of and authorized all the policies and procedures used in the call room.  Big Apple staffed the call room with as many as fifty employees, who used internally-drafted press releases and "bullet sheets" to draw attention among the broker-dealer community to its clients.

### b. The Department of Homeland Security Contract

At first, there was no demand for CyberKey stock, but that changed when Plant began reporting fabricated contracts.  First, Plant falsely informed Big Apple—on three separate occasions—that CyberKey had been awarded a valuable contract with a fictitious part of the government called the "Military Post

Exchange" (MPX).  The purported contract allegedly was valued at $15 million,

then increased to $19 million, and then to $23.9 million.  Both Jablon and Kaley

were aware of this claimed purchase order.  On each occasion that Plant raised the

MPX contract price, the MSI staff drafted a press release that covered details such

as the dollar figure of the order and the number of units requested, and each time

MSI held the release pending its distribution by CyberKey.  On November 11,

2005, approximately four hours after MSI drafted the latest press release

announcing a $23.9 million MPX order for 185,000 units and while awaiting

Plant's approval to publish the release, MSI abruptly revised the press release to

reflect a $24.49 million order from the Department of Homeland Security (DHS)

for 150,000 units (the DHS contract).  Any announcement of the MPX contract

was abandoned without explanation.

The newly-announced, fictitious DHS contract  was a game changer.  Jablon

characterized it as "[o]ne in a million," and both he and Kaley thought the contract

would significantly increase demand for CyberKey stock.

Plant showed Jablon and Kaley a document he purported was the DHS

contract, and it contained several obvious inconsistencies.  Neither Jablon nor

Kaley looked closely at the contract.  Although the contract was supposedly with

DHS, a federal entity, the eight-page document contained multiple references to

the State of Connecticut, including a mailing address in the state, a state e-mail

address for the purchasing contact, and several contract terms that expressly

identified the "State of Connecticut" or "the State" as the counter-party.  In fact,

only the cover page and the header of each page of the document referred to the

DHS.  Further, the contract's stated value—$24,494,412.15—differed from the

amounts Plant had previously reported to the defendants relating to the original

MPX deal.  The contract award date was also internally inconsistent.  On the first

and second pages of the contract, the award date was listed as October 31, 2005,

but two pages later it was listed as August 12, 2005.

CyberKey publicized the DHS contract in a December 8, 2005 press release

that announced "the Company [had received] a multi-million [d]ollar purchase

order from the Department of Homeland Security . . . [for over] 150,000 units."

MSI drafted the press release and Big Apple was listed as the primary contact,

along with the telephone number 1-866-THE-APPL(E).  Incoming brokers' calls

were routed to Big Apple's sales floor, and investors' calls were routed to MSI's

investor relations team.  Over the next fifteen months, the defendants conceived,

drafted, edited, or reviewed numerous press releases emphasizing the $25 million

DHS contract or aspects related to it.  The defendants also drafted press releases

announcing the first two shipments of USB devices to DHS and CyberKey's

receipt of two $4.2 million payments from DHS.

During this time, Big Apple used its call room to aggressively promote CyberKey to broker-dealers; Big Apple routinely designated CyberKey the "on focus" client, making it a priority in salespeople's calls. For example, out of a given sixty day period, CyberKey was "on focus" for thirty to forty-five of those days. The defendants prepared or approved the preparation of "bullet sheets" detailing talking points about CyberKey and circulated them to its salespeople in the call room. Generally, Big Apple and MJMM did not disclose to brokers or investors that compensation for representing CyberKey came in the form of stock.

### c. The Scheme Unravels

Additional signs of Plant's dishonesty surfaced in the coming months. In January 2006, Plant sent CyberKey's first financial statement for public release, and, according to Jablon, the financial statements looked like they "were prepared by a third grader [and] there was a lot missing." Despite landing the fabricated DHS contract and supposedly being in receipt of the first $4.2 million payment, CyberKey's checking account held a balance of around $6,000. Plant explained CyberKey's cash shortage was due to the nature of the DHS contract, which was "front-loaded" and that CyberKey would make all its money "on the back end." Jablon unsuccessfully attempted to have a third-party auditor review CyberKey's financials, but Plant kept "pushing it off." Plant regularly went "AWOL" and would be unreachable for days or even a week at a time. Kaley and Keith flew to

San Diego for several meetings with Plant and potential buyers, but shortly before each meeting was scheduled to occur, Plant would indicate the meeting was rescheduled or canceled.

During the summer of 2006, because of Plant's repeated problematic behavior, Jablon asked his brother Keith to draft a list of problems that employees were having with Plant so that Jablon could discuss the issues with Plant. This became known as the "broken promises" memorandum. The memorandum detailed thirteen separate "missed promises" made by Plant. After Jablon received the broken promises memorandum from Keith, he emailed it to Kaley.

On August 3, 2006, the National Association of Securities Dealers (NASD), now known as the Financial Industry Regulatory Authority (FINRA), sent a fax to Plant informing him that it was reviewing CyberKey's trading activity. NASD requested that CyberKey provide it with the "documents and information" concerning: (1) the DHS contract; (2) an explanation of how the DHS contract was negotiated; (3) a list of CyberKey's contacts at DHS; and (4) details of CyberKey's relationship with Big Apple. Plant e-mailed the fax to Jablon and Kaley, and they advised Plant to have his securities attorney handle the matter. Jablon and Kaley did not follow up on the status of the inquiry.

Five days later, after speaking with Plant, a DHS official called an employee at MSI, Kelson Monks (Monks), to inquire about CyberKey's claimed relationship

with DHS.  The DHS official informed Monks that he was unable to locate the purchase order relating to a press release CyberKey had recently issued, and the DHS official faxed a confirmation of the conversation seeking any identifying information about the DHS contract from CyberKey.  The press release in question announced that DHS had added a $600,000 order for biometric drives to an existing $25 million order.  Monks sent the fax from the DHS to Kaley and Jablon, but they did not respond to the request and opted to let Plant handle the matter.

On February 5, 2007, the SEC issued an order suspending the trading of CyberKey stock due to concerns as to the accuracy of assertions made by CyberKey and others in press releases and public statements to investors.  From February 20, 2007, the date that CyberKey's trading suspension was temporarily lifted, to March 20, 2007, the date CyberKey was de-listed and could no longer be traded, MJMM was a heavy seller of its holdings in the stock.  Over the course of the defendants' relationship with CyberKey, Big Apple and MJMM sold more than a combined 720 million CyberKey shares for approximately $7.8 million.  During the time that CyberKey was a client, it was one of the top five most actively traded stocks on Pink Sheets.

The SEC brought suit against Plant for his role in the scheme.  Plant was also indicted and convicted on charges of securities fraud.  In 2009, he was

sentenced to ninety-seven months imprisonment in connection with the criminal charges.

## PROCEDURAL BACKGROUND

The SEC filed its complaint in federal court and alleged that not later than August 8, 2006, the defendants "knew, or were severely reckless in not knowing, that CyberKey did not have a $25 million purchase order from the DHS or any other [f]ederal government agency, and thus had very little legitimate revenue at all." Nonetheless, the defendants "persisted in promoting CyberKey and selling hundreds of millions of unregistered CyberKey shares to unsuspecting investors." The SEC asserted that the defendants violated various sections of the Securities Act and the Exchange Act.

After the Supreme Court decided *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011), which defined what it means to "make" a false statement under SEC Rule 10b-5(b),[2] the district court granted the SEC's motion to amend its complaint.   In turn, the SEC withdrew its claims that defendants violated § 10(b) of the Exchange Act and Rule 10b-5, and replaced them with claims that defendants violated § 20(e) of the Exchange Act by aiding and abetting CyberKey's and Plant's violations of § 10(b) and Rule 10b-5.

---

[2] 17 C.F.R. § 240.10b-5.  Rule 10b-5 is promulgated under § 10(b) of the Exchange Act.

Ultimately, the SEC's amended complaint asserted that: (i) all defendants violated § 17(a) of the Securities Act and aided and abetted violations of § 10(b) of the Exchange Act and SEC Rule 10b-5, in violation of § 20(e) of the Exchange Act; (ii) Big Apple, MJMM, and Marc Jablon violated § 5(a) and (c) of the Securities Act; (iii) Big Apple and MJMM violated § 15(a) of the Exchange Act; and (iv) Jablon and Kaley aided and abetted the § 15(a) violations, in violation of § 20(e) of the Exchange Act.  The district court granted summary judgment in favor of the SEC as to claims (ii), (iii), and (iv).

Only the claims under (i)—that the defendants violated § 17(a) of the Securities Act and aided and abetted violations of § 10(b) of the Exchange Act and SEC Rule 10b-5, in violation of § 20(e) of the Exchange Act—proceeded to trial. At the conclusion of the SEC's case, the defendants orally moved for judgment as a matter of law under Fed. R. Civ. P. 50(a).  They argued that the SEC presented insufficient evidence to establish actual knowledge, which they maintained was required to establish a violation of § 20(e) of the Exchange Act.  The district court reserved ruling, and the defendants orally renewed their motion after presenting their defense, adding an argument that in light of the Supreme Court's decision in *Janus*, the § 17(a) claims should not have gone to the jury.

The jury returned a verdict finding that the defendants violated each of the three subsections of § 17(a) and that the defendants violated § 20(e), marking on

the verdict form that the defendants acted with both actual knowledge and severe recklessness.  After trial, the defendants orally renewed their Rule 50(b) motion and argued that the jury was improperly instructed that it could find the defendants liable if they acted with deliberate ignorance.  Big Apple, MJMM, and Jablon filed a written Rule 50(b) motion, in which they argued that the evidence was insufficient to support that the defendants acted with deliberate indifference and that the instruction misstated the law by not focusing on the defendants' subjective beliefs.  Kaley, proceeding *pro se*, also filed a Rule 50(b) motion arguing that the evidence was insufficient to support the claims asserted against him.  The court denied both motions.

Defendants raise six errors on appeal.  They claim the district court erred by: (1) submitting the § 17(a) claims to the jury in light of the Supreme Court's decision in *Janus*; (2) instructing the jury that § 20(e) violations may be established by showing actual knowledge or severe recklessness; (3) improperly instructing the jury with regard to deliberate ignorance;  (4) granting partial summary judgment in favor of the SEC; (5) excluding certain evidence and expert testimony; and (6) denying Kaley's sufficiency of the evidence claim in his Rule 50(b) motion.

## ANALYSIS

### 1. Primary Violations of § 17(a) of the Securities Act

We review the district court's rulings concerning questions of law *de novo*.

*SEC v. Merch. Capital, LLC*, 483 F.3d 747, 754 (11th Cir. 2007).

The defendants argue that the decision in *Janus*—a case that defined the word "make" as it relates to SEC Rule 10b-5(b)'s prohibition against "mak[ing] any untrue statement of a material fact"—extends to claims brought under § 17(a) of the Securities Act. In *Janus*, the Court considered whether an LLC mutual fund investment adviser could be held liable in a private action under Rule 10b-5(b) for misleading statements contained in its clients' prospectuses, which the adviser was involved in preparing. 131 S. Ct. at 2299. The Court answered in the negative and explained that "[o]ne who prepares or publishes a statement on behalf of another is not its maker." *Id.* at 2302. Rather, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* According to the defendants' logic, because they did not have ultimate authority over the content of CyberKey's press releases, they could not be considered "makers" of any material misstatements and thus could not be liable under the provisions of § 17(a), which they assert are "largely coextensive in scope" to those of Rule 10b-5. We disagree.

Our conclusion is driven by an adherence to the statutory text.  Section 17(a) of the Securities Act makes it:

> unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
> > (1) to employ any device, scheme, or artifice to defraud, or
> > (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> > (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).  Though Rule 10b-5 regulates a different activity, i.e., the "purchase or sale" of securities rather than their "offer or sale," it borrows much, though not all, of its language from § 17(a).  That is not by coincidence.  *See Hooper v. Mountain States Sec. Corp.*, 282 F.2d 195, 201 n.4 (5th Cir. 1960), *cert. denied*, 365 U.S. 814 (1961); *United States v. Persky*, 520 F.2d 283, 287 (2d Cir. 1975).  Rule 10b-5 makes it:

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce . . .
> > (a) To employ any device, scheme, or artifice to defraud,
> > (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> > (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  The overlap is most pronounced in Rule 10b-5 subsections

(a) and (c), which, like § 17(a) subsections (1) and (3), prohibit schemes to defraud

and fraudulent courses of business, respectively.  However, subsections (1) and (3)

in § 17(a) and subsections (a) and (c) in Rule 10b-5 do not use the word "make" or

even address misstatements.  The Court in *Janus* interpreted what it means to

"make" a misrepresentation under subsection (b) of Rule 10b-5.  Thus, any

attempts by the defendants to import the Court's narrow holding to the *entirety* of

§ 17(a) is untenable on its face.  *See SEC v. Garber*, 959 F. Supp. 2d 374, 380

(S.D.N.Y. 2013) ("*Janus* would not affect claims under Section 17(a)(1) . . . .").

Indeed, the Court recognized in *Cent. Bank of Denver N.A. v. First Interstate*

*Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994), that, despite foreclosing private

aiding and abetting liability under § 10(b), "secondary actors in the securities

markets . . . who employ[] a manipulative device . . . on which a purchaser or seller

of securities relies may be liable as a primary violator under SEC Rule 10b-5,

assuming *all* of the requirements . . . are met."  *See also Stoneridge Inv. Partners,*

*LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 166 (2008) (citing *Cent. Bank*, 511

U.S. at 191) ("[T]he implied right of action in § 10(b) continues to cover secondary

actors who commit primary violations.").  Therefore, the reality remains that even

a person like the mutual fund investment adviser in *Janus*, who is not the "maker"

of an untrue statement of material fact, nonetheless could be liable as a primary

violator of Rule 10b-5(a) and (c).  *See SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 287 (2d Cir. 2013) ("[S]ubsection (b) . . . was the only subsection at issue in *Janus*."); *Garber*, 959 F. Supp. 2d at 380 ("*Janus* does not extend to claims based on schemes to defraud under Rule 10b-5(a) and (c).").  Given that § 17(a)(1) and (3), on which Rule 10b-5(a) and (c) are modeled, do not contain the word "make" or address misstatements, and given that the Court in *Janus* did not alter the potential for liability under Rule 10b-5(a) and (c), it would be incongruous to remove the potential for liability under § 17(a)(1) and (3).

The defendants' primary contention is that because § 17(a)(2) is the analogue to Rule 10b-5(b), therefore the Court's holding in *Janus* should apply to § 17(a)(2).  Recall, § 17(a)(2) renders it "unlawful for any person in the offer or sale of any securities . . . to obtain money or property *by means of* any untrue statement of a material fact or any omission to state a material fact."  (Emphasis added.)  "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning."  *See Smith v. United States*, 508 U.S. 223, 228 (1993).  The Supreme Court has also recognized that "[t]he use of different terms within related statutes generally implies that different meanings were intended."  *United States v. Bean*, 537 U.S. 71, 76 n.4 (2002).  We have not yet addressed the definition of "by means of" in § 17(a)(2), but we agree with the First Circuit that "the text suggests that . . . it is irrelevant for purposes of liability

whether the seller uses his own false statement or one made by another individual."
*See SEC v. Tambone*, 550 F.3d 106, 127 (1st Cir. 2008).[3]  While the First Circuit's
decision in *Tambone* was rendered prior to the Court's decision in *Janus*, its point
is well-taken.  *SEC v. Tambone*, 597 F.3d 436 (1st Cir. 2010) (en banc).  "In short,
the drafters of Rule 10b–5 had before them language that would have covered the
'use' of an untrue statement of material fact . . . They declined to do so. Instead,
the drafters—who faithfully tracked section 17(a) in other respects—deliberately
eschewed the expansive language of section 17(a)(2)."  *Id.* at 444.  Likewise, we
also agree with the Securities and Exchange Commission's recent opinion, which
held "*Janus*'s limitation on primary liability under Rule 10b-5(b) does not apply to
claims arising under Section 17(a)(2)."  *In the Matter of John P. Flannery and
James D. Hopkins*, Admin. Proc. File No. 3-14081, at 15 (Dec. 15, 2014).[4]

One final aspect of the Court's decision in *Janus* solidifies our conclusion
that the Court's definition of "to make" in Rule 10b-5 does not apply to § 17(a)(2).
*Janus* involved a private action under Rule 10b-5.  "[N]either Rule 10b-5 nor
§ 10(b) expressly creates a private right of action, [though the Supreme] Court has
held that 'a private right of action is implied under § 10(b).'"  *Janus*, 131 S. Ct. at
2301 (quoting *Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S.

---

[3] The First Circuit vacated this decision by granting *en banc* review on an unrelated issue.  *SEC v. Tambone*, 573 F.3d 54 (1st Cir. 2009).  It subsequently reinstated the § 17(a)(2) analysis from the panel decision in its *en banc* opinion.  *See SEC v. Tambone*, 597 F.3d 436, 450 (1st Cir. 2010) (en banc).

[4] *Available at* https://www.sec.gov/alj/aljdec/2011/id438bpm.pdf.

6, 13, n.9 (1971)).  For that reason, the Court remained "mindful" that it had to

"give 'narrow dimensions . . . to a right of action Congress did not authorize when

it first enacted the statute and did not expand when it revisited the law.'"  *Id.* at

2302 (quoting *Stoneridge*, 552 U.S. at 167).  Unlike Rule 10b-5, however, there is

no private right of action under § 17(a).  *Currie v. Cayman Res. Corp.*, 835 F.2d

780, 784–85 (11th Cir. 1988).  Accordingly, there is not the same concern

regarding the expansion of a judicially-created private cause of action.

We therefore decline the defendants' invitation to supplant the language of

§ 17(a)(2) with words taken from another authority, particularly with words

"beyond the four corners of the [Securities] Act." *Gustafson v. Alloyd Co., Inc.*,

513 U.S. 561, 595 (1995) (Thomas, J., dissenting); *see also Pinter v. Dahl*, 486

U.S. 622, 653 (1988) ("The ascertainment of congressional intent with respect to

the scope of liability created by a particular section of the Securities Act must rest

primarily on the language of that section.").  We conclude that "obtain[ing] money

. . . *by means of* any untrue statement" under § 17(a)(2) of the Securities Act

encompasses a broader range of conduct than "mak[ing]" such a statement as

defined in SEC Rule 10b-5(b).  Finally, even if we accepted the defendants'

position that these two phrases are equivalent, which we do not, the defendants

ignore the fact that the jury found the defendants violated not only § 17(a)(2), but

also § 17(a)(1) and (3), which are in no way directly or indirectly affected by the

*Janus* decision.  As stated in the district court's instructions to the jury, to show a

violation of § 17(a), "[i]t is not necessary that the SEC prove that the [d]efendants

engaged in all three types of conduct" set forth in subsections (1) – (3).  Instead, as

properly instructed, "[a]ll that the SEC needs to prove to prevail is that the

[d]efendants engaged in any one of the types of conduct."

**2.  § 20(e) of the Exchange Act Liability**

The defendants next contend that the SEC needed to prove that the

defendants had "actual knowledge" of CyberKey's and Plant's violations of

§ 10(b) and Rule 10b-5 in order to be found liable under § 20(e) of the Exchange

Act, 15 U.S.C. § 78t(e).  Section 20(e) of the Exchange Act was adopted as part of

the Private Securities Litigation Reform Act of 1995 (PSLRA), and at the time

relevant to this case, it authorized the SEC to bring an action against any person

who "knowingly provides substantial assistance" to a primary violator of the

Exchange Act.  15 U.S.C. § 78t (2000)[5], *amended by* 15 U.S.C. §78t(e) (2010).[6]

The defendants insist "both the history and the express language of Section 20(e)

demonstrate conclusively that actual knowledge is required" to sustain a claim

under § 20(e).  Therefore, they argue that the district court erred when it relied on

---

[5] The relevant statute was originally codified in subsection (f) and was later changed to
subsection (e).

[6] As explained later in this section, Congress amended §20(e) in 2010 to include the language "or
recklessly."  However, we analyze the amendment as was in effect at the time the underlying
facts occurred  in this case.  Thus, a citation to 15 U.S.C. § 78t(e) refers to the pre-2010
amendment, unless the citation is followed by the year 2010.

*Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1010 (11th Cir. 1985)

for the proposition that "[s]evere recklessness can satisfy the scienter requirement

in an aiding and abetting case[.]"

The SEC's amended complaint asserts two separate violations of § 20(e).

The first claim—that all the defendants aided and abetted Plant's and CyberKey's

violations of § 10(b) of the Exchange Act and Rule 10b-5, in violation of § 20(e) of

the Exchange Act—proceeded to trial.  The second § 20(e) claim—that Jablon and

Kaley aided and abetted Big Apple's and MJMM's violations of § 15(a) of the

Exchange Act—was resolved in favor of the SEC by summary judgment.  In its

order granting summary judgment, the district court concluded that Jablon and

Kaley were liable under § 20(e) of the Exchange Act because they "were at least

severely reckless in providing substantial assistance to Big Apple's and MJMM's

§ 15(a) violations."  At trial, the district court instructed the jury that it could find

that the defendants acted "knowingly" for purposes of § 20(e) if the defendants

"knew or were *severely reckless* in not knowing that James Plant and CyberKey

Solutions, Inc. were fraudulently disseminating false statements that CyberKey had

obtained a $25 million DHS contract."  (Emphasis added.)  While argument

relating to the district court's summary judgment ruling is sparse, we will review

both rulings.  The question is whether § 20(e) of the Exchange Act, as in effect at

the time of this case, required proof of "actual knowledge" of the underlying fraud, or whether a showing of severe recklessness would also suffice.

We review both jury instructions and the district court's grant of summary judgment under these circumstances *de novo*. *United States v. Campa*, 529 F.3d 980, 992 (11th Cir. 2008); *Patton v. Triad Guar. Ins.*, 277 F.3d 1294, 1296 (11th Cir. 2002).

Contrary to the defendants' claim, the language of § 20(e) of the Exchange Act does not contain the phrase "actual knowledge." Congress required proof of "actual knowledge" in order to impose liability in other sections of the Exchange Act. *See, e.g.*, 15 U.S.C. § 78u-5(c)(1)(B) ("[T]he plaintiff fails to prove that the forward looking statement—(i) . . . was made with *actual knowledge* by that person that the statement was false or misleading[.]" (emphasis added)). Thus, had Congress intended to require actual knowledge to establish culpability under 15 U.S.C. § 78t(e), it could have done so expressly, as it did with other provisions in the Exchange Act.

Moreover, § 20(e) itself does not include a definition of the term "knowingly." The Exchange Act likewise does not provide a standard definition for the term "knowingly." Where the term "knowingly" is defined, the definition applies only to a particular section or subsection of the Exchange Act. For example, one section of the Exchange Act defines "knowingly" as requiring

"actual knowledge," *see, e.g.*, 15 U.S.C. § 78u-4(f), while another section defines

"knowing" as being "aware" or having "a firm belief."  15 U.S.C. § 78dd-2(h)(3).

Thus, we look to the legislative history of § 20(e) for guidance.  In 1994, the

Supreme Court held that private plaintiffs could not pursue aiding and abetting

claims through § 10(b) of the Exchange Act.  *Cent. Bank of Denver, N.A. v. First*

*Interstate Bank of Denver*, *N.A.*, 511 U.S. 164, 191 (1994).  The Court's decision

in *Central Bank* cast doubt on whether the SEC could pursue aiding and abetting

claims under § 10(b).  Thereafter, Congress enacted § 20(e) of the Exchange Act as

an independent authority for the SEC to pursue aiding and abetting claims.

Congress acted to "revers[e] the Supreme Court's *Central Bank* decision as it

applies to the SEC."  141 Cong. Rec. S17965-03 (daily ed. Dec. 5, 1995)

(statement of Senator Reid).  *See also* 141 Cong. Rec. S17933-04 (daily ed. Dec. 5,

1995) (statement of Sen. D'Amato) ("The conference report also reinstates the

SEC's authority—which the Supreme Court put into question in the *Central Bank*

*of Denver* case—to bring actions against defendants who knowingly aid and abet

securities fraud.").  The legislative history of § 20(e) "consistently make[s] clear

that the amendment's purpose is to negate any effect *Central Bank* might have had

on the SEC's authority to bring [enforcement] actions against" those who aid and

abet primary violators of the Exchange Act.  *SEC v. Fehn*, 97 F.3d 1276, 1288 (9th

Cir. 1996).[7]  Thus, Congress enacted § 20(e) to preserve the status quo that existed

prior to the Court's decision in *Central Bank*.

Congress clearly contemplated and condoned the pre-*Central Bank* approach

taken by most federal courts.  For example, the Senate recognized that:

> Prior to 1994, courts in every circuit in the country had recognized the
> ability of investors to sue aiders and abettors of securities frauds . . .
> [M]ost courts required that an investor show that a securities fraud
> was committed, that the aider and abettor gave substantial assistance
> to the fraud, and that the aider and abettor has some degree of scienter
> (intent to deceive or *recklessness* toward the fraud).

S. Rep. No. 104-98, at 48–49 (1995) (emphasis added); *see also* 141 Cong. Rec.

S9199-03 (daily ed. Jun. 28, 1995) ("Until last year, this private cause of action

[against aiders and abettors] was available in every circuit in America, provided

that the assistance was substantial and had some element of deception or

recklessness.").

One such pre–*Central Bank* approach was our decision in *Woods v. Barnett

Bank of Ft. Lauderdale*, 765 F.2d 1004 (11th Cir. 1985).   In *Woods*, we applied a

three-part test for aiding and abetting liability, which required:  (1) a primary

violation by another party; (2) a "general awareness" by the accused aider-abettor

"that his role was part of an overall activity that is improper"; and (3) that "the

accused aider-abettor" must have "knowingly and substantially assisted the

---

[7] Although we disagree with the ultimate outcome reached by the Ninth Circuit in *SEC v. Fehn*
with respect to the requisite scienter necessary to sustain aiding and abetting liability, its analysis
of the legislative history underlying § 20(e) is sound.

violation." *Id.* at 1009-10.  In *Woods*, we further concluded that "[s]evere

recklessness can satisfy the scienter requirement in an aiding and abetting case."

*Id.* at 1010.  Every other circuit to consider the issue adopted a similar test and

acknowledged that severe recklessness could suffice.  *See, e.g.*, *Cleary v.*

*Perfectune, Inc.*, 700 F.2d 774, 777 (1st Cir. 1983); *Armstrong v. McAlpin*, 699

F.2d 79, 91 (2d Cir. 1983); *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 621 (5th Cir.

1993); *Herm v. Stafford*, 663 F.2d 669, 684 (6th Cir. 1981); *Camp v. Dema*, 948

F.2d 455, 459 (8th Cir. 1991); *First Interstate Bank of Denver, N.A. v. Pring*, 969

F.2d 891, 903 (10th Cir. 1992), *rev'd on other grounds sub nom. Cent. Bank of*

*Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994); *Dirks*

*v. SEC*, 681 F.2d 824, 844–45 (D.C. Cir. 1982), *rev'd on other grounds*, 463 U.S.

646 (1983).  "[W]e apply the presumption that Congress was aware of these earlier

judicial interpretations and, in effect, adopted them."  *Keene Corp. v. United*

*States*, 508 U.S. 200, 212 (1993).  Moreover, § 20(e)'s language is almost identical

to the third prong of the test applied in *Woods*, which demonstrates Congress's

intent to act in a manner consistent with existing precedent, not opposed to it.

*Compare* 15 U.S.C. § 78t(e) ("knowingly provides substantial assistance"), *with*

*Woods*, 765 F.2d at 1009 ("knowingly and substantially assisted the violation").

"When Congress codifies a judicially defined concept, it is presumed, absent an

express statement to the contrary, that Congress intended to adopt the

interpretation placed on that concept by the courts." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 813 (1989).

In 2010, after the events giving rise to this case concluded, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), which amended § 20(e) of the Exchange Act and added the phrase "or recklessly" to satisfy the scienter requirement in aiding and abetting cases. Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 (2010); 15 U.S.C. § 78t(e) (2010). The defendants argue that Congress's amendment to include recklessness "remove[s] all doubt" that, prior to the Dodd-Frank Act, "actual knowledge" was required under § 20(e). We disagree.

The amendment to § 20(e) was intended to correct the holding of "[a] growing number of courts" who concluded "that knowingly means actual knowledge, rather than recklessness." H.R. Rep. No. 111-687(I), at 80 (2010). The amendment "clarif[ies] that recklessness is sufficient for bringing an aiding and abetting action." *Id.*; *see also* H.R. Rep. No. 111-517, at 870 (2010) (Conf. Rep.) (stating that the amendment to § 20(e) "makes clear that the intent standard in SEC enforcement actions for aiding and abetting is recklessness"). Any arguments concerning the retroactivity of the amendment to § 20(e) are misplaced because "concerns about retroactive application are not implicated when an amendment that takes effect after the initiation of a lawsuit is deemed to clarify

relevant law rather than effect a substantive change in the law." *Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1283 (11th Cir. 1999).

The defendants next cite *SEC v. Yun*, 327 F.3d 1263 (11th Cir. 2003), in support of their argument that § 20(e) requires proof of actual knowledge, but this argument also misses the mark.   In *Yun*, the SEC brought suit under § 10(b) of the Exchange Act against certain individuals using the tipper-tippee "misappropriation theory" of insider trading.  *Id.* at 1267.   "The misappropriation theory . . . imposes liability on 'outsiders' who trade on the basis of confidential information obtained by reason of their relationship with the person possessing such information, usually an insider."  *Id.* at 1269.

In *Yun*, we rejected the SEC's contention that "it did not have to prove that [the tipper] divulged the information *for her own benefit*; [and instead] all it had to show was that [the tipper] acted with 'severe recklessness.'"  *Id.* at 1274 (emphasis added).  Since we had already concluded that "intent to benefit" was an element under the classical theory of liability, we were asked to decide whether the SEC similarly was required to prove the tipper's "intent to benefit" as a separate element under the misappropriation theory of liability.  *Id.*  We answered in the affirmative.  *Id.* at 1275–76.  The SEC had sought to forgo being required to establish a separate *element* under the misappropriation theory—that the tipper *expected to receive a benefit*.  *Id.*  By contrast, the jury in the present case was

27

instructed that it could find liability under § 20(e) of the Exchange Act by finding that the defendants knew or were severely reckless in not knowing that Plant and CyberKey violated § 10(b) of the Exchange Act and Rule 10b-5.

Finally, even if we were to assume that § 20(e) requires proof of "actual knowledge," the defendants would still be liable as to the § 20(e) claim submitted to the jury.  That is, any error in the jury instructions is harmless because the jury found that the defendants acted both with actual knowledge and with severe recklessness.  The district court instructed the jury several times that the scienter interrogatories concerning § 20(e) did not require them to mark only one level of scienter, but instead that they could mark both or either.

Ultimately, we conclude that the district court did not err when it found that severe recklessness was sufficient to constitute acting "knowingly" under § 20(e) of the Exchange Act.

### 3.  Deliberate Ignorance Jury Instruction

The defendants next contend that the district court erred by including a "deliberate ignorance" instruction and by failing to include language in the deliberate ignorance instruction that would focus on the defendants' subjective beliefs.

During trial, the defendants objected to the inclusion of a deliberate ignorance instruction because "it is [a] criminal jury instruction, [and] has no

application in a civil case."  The defendants also maintained that the "deliberate ignorance" instruction was an incorrect legal standard, but they could not cite "any authority to [contradict] the substantive merits."  Now, the defendants also argue that the wording of the deliberate ignorance instruction failed to "focus on the [d]efendants' subjective beliefs and deliberate actions."  (Emphasis omitted.)

Because the defendants objected below, we review the inclusion of a deliberate ignorance instruction *de novo*.  *See United States v. Campa*, 529 F.3d 980, 992 (11th Cir. 2008).  "If the instructions accurately reflect the law, the district court enjoys 'wide discretion as to the style and wording employed in its instruction[s].'"  *Id.* (citation omitted).  Because the defendants did not object to the language of the instruction as it relates to the subjective beliefs of the defendants, we review the language of the deliberate ignorance instruction for plain error.  *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1287–88 (11th Cir. 2002);  Fed. R. Civ. P. 51.  "In addition, we have announced that reversal for plain error in the jury instructions . . . will occur only in *exceptional cases* where the error is so fundamental as to result in a miscarriage of justice."  *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1329 (11th Cir. 1999) (internal quotation marks omitted).  Here, the defendants failed to object to the language of the deliberate ignorance instruction until after a verdict had been reached and all but

admitted in their motion for judgment as a matter of law that "plain error" review applies to the "wording of the jury instructions."

We have long recognized that "the knowledge element of a violation of a criminal statute can be proved by demonstrating either actual knowledge or deliberate ignorance." *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000); *see United States v. Arias*, 984 F.2d 1139, 1143 (11th Cir. 1993) (noting that deliberate ignorance is "the equivalent of knowledge" (internal quotation marks omitted)). We have also explained that "deliberate ignorance . . . is based on the alternative to the actual knowledge requirement at common law that if a party has his suspicion aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance, he is deemed to have knowledge." *United States v. Rivera*, 944 F.2d 1563, 1570 (11th Cir. 1991) (internal quotation marks omitted). "To act 'knowingly,' therefore, is not necessarily to act only with positive knowledge, but also to act with an awareness of the high probability of the existence of the fact in question." *Id.* (citation omitted).

While our precedent relates to deliberate ignorance in criminal cases, it follows that the standard should similarly apply in civil cases, in which the burden of proof is lower and protections surrounding defendants are lessened. In reaching this conclusion, "we draw guidance from the well-developed law of aiding and

abetting liability in criminal cases; for if the conduct of an aider and abettor is

sufficient to impose criminal liability, *a fortiori* it is sufficient to impose civil

liability in a government enforcement action."  *SEC v. Apuzzo*, 689 F.3d 204, 212

(2d Cir. 2012).  Indeed, the Supreme Court has recently recognized that a

deliberate ignorance instruction is also appropriate in civil actions.  *See Global-*

*Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2069 (2011) ("[W]e can see no

reason why the doctrine [of deliberate ignorance] should not apply in civil

lawsuits . . . .").

       To the extent the defendants also suggest that the facts of this case were

insufficient to warrant a deliberate ignorance instruction, we conclude that there

was more than sufficient evidence to support the instruction.  It is true that the

deliberate ignorance instruction should only be given where there is evidence that

"the defendant purposely contrived to avoid learning the truth."  *United States v.*

*Stone*, 9 F.3d 934, 937 (11th Cir. 1993) (internal quotation marks omitted).

Moreover, we have concluded that "a district court should not instruct the jury on

'deliberate ignorance' when the relevant evidence points only to actual

knowledge."  *Rivera*, 944 F.2d at 1571 (emphasis omitted).  But the evidence

presented at trial is consistent with the SEC's theory that the defendants acted with

deliberate ignorance of what would otherwise be obvious fraud and/or that they

acted with severe recklessness to assist in fraud that was so obvious that they must have been aware of it.

At trial, the evidence showed that the defendants were aware of Plant's evasiveness and, at times, bizarre behavior. The defendants were aware of the purported MPX contract. They helped draft press releases about the MPX contract, which increased in value three times and suddenly was dropped altogether without explanation. The evidence showed that the defendants were aware of the "one in a million" contract CyberKey allegedly acquired with DHS and that the DHS contract was riddled with problematic language and internal inconsistencies. The defendants were aware of Plant's claim that CyberKey received a $4.2 million payment from DHS, but CyberKey only held $6,000 in its bank account. The defendants received inquiries from NASD and DHS about the DHS contract but did nothing to follow up on the legitimacy of the DHS contract. As the district court found, the SEC also submitted evidence that the defendants had a motive to deliberately ignore Plant's and CyberKey's fraud because the defendants were paid in CyberKey stock and purchased CyberKey stock at deep discounts. In sum, we agree with the district court that "the SEC presented sufficient evidence for the jury to determine that [the] [d]efendants were aware of a high probability that the DHS contract was fraudulent and that they took deliberate

actions to avoid learning that fact.  Therefore, instructing the jury on deliberate ignorance was proper."

Next, the defendants argue that even if providing a deliberate ignorance instruction was proper, the instruction "should have advised the jury to focus on the [d]efendants' subjective beliefs and deliberate actions."  (Emphasis added.) We reiterate that we review for plain error and will only reverse if "the error is so fundamental as to result in a miscarriage of justice."  *Farley*, 197 F.3d at 1329.

The jury instruction in the present case is consistent with our precedent.  It stated:

> [T]he SEC may prove a [d]efendant acted knowingly or recklessly by proving, by a preponderance of the evidence, that a [d]efendant deliberately closed his eyes to what would otherwise have been obvious to him.  No one can avoid liability under the securities laws by deliberately ignoring what is obvious.  You may infer knowledge of the existence of a fact if a [d]efendant was aware of a high probability of the existence of that fact and purposely contrived to avoid learning all the facts.  If you find by a preponderance of the evidence that a [d]efendant intentionally avoided knowledge or enlightenment, you may find that [d]efendant acted knowingly or recklessly.

The court reiterated this instruction when the jury asked: "Is the definition of . . . 'actual knowledge,' . . . the same as . . . 'acted knowingly' on page 36 of the instructions?"  Page thirty-six of the instructions provided the deliberate ignorance instruction.  The court responded: "My answer to you is actual knowledge may be

established by proving by a preponderance of the evidence that a defendant deliberately closed his eyes to what would otherwise have been obvious to him."[8]

We agree with the defendants that the deliberate ignorance instruction, also referred to as the "willful blindness" instruction, contains "two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech*, 131 S. Ct. at 2070. However, the instruction adequately conveyed these two principles, and there was no plain error.

The deliberate ignorance instruction clearly communicated the "deliberate" component that the defendants insist was missing. The instruction stated that the SEC may establish knowledge by proving by a preponderance of the evidence that a particular defendant "*deliberately* closed his eyes," "*purposely* contrived to avoid learning the facts," and "*intentionally* avoided knowledge or enlightenment." (Emphasis added.)

The thrust of the defendants' argument relates to the subjective component of the deliberate ignorance instruction. They maintain that the instruction should have included terminology similar to the Eleventh Circuit's criminal pattern

---

[8] The district court could have clarified the instruction by stating the jury could find the defendants acted "with  knowledge" by behaving with deliberate ignorance, rather than  stating that the jury could find that the defendants acted with "actual knowledge" through deliberate ignorance.  However, any error by phrasing the language as "actual knowledge" was harmless because the evidence, though circumstantial, strongly supported finding that the defendants acted "knowingly" by being deliberately ignorant of the facts. *See United States v. Perez-Tosta*, 36 F.3d 1552, 1565 (11th Cir. 1994).

instruction on deliberate ignorance, which reads: "If a Defendant's knowledge of a fact is an essential part of a crime, it's enough that the Defendant was aware of a high probability that the fact existed – unless the Defendant actually believed the fact didn't exist."  Eleventh Cir. Pattern Jury Instr. Crim. No. 8 "Deliberate Ignorance as Proof of Knowledge" (2010).  But a district court is not required to use magic language to convey the law.  Instead, "[w]e will only reverse the lower court because of an erroneous instruction if we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *McCormick v. Aderholt*, 293 F.3d 1254, 1260 (11th Cir. 2002) (internal quotation marks omitted).

While the deliberate ignorance instruction in the instant case did not include the "actual belief" language, the instruction did focus on the individual defendant's subjective belief.  The instruction indicated that the jury could find that a defendant acted with knowledge if the "[d]efendant intentionally avoided knowledge or enlightenment."  The "actual belief" language the defendants now insist should have been included is simply the converse of the instruction given.  In other words, a defendant who did not actually believe there was fraud would not be "intentionally avoid[ing] knowledge or enlightenment" because he would have nothing to believe he was avoiding.  Even though the language championed by the

defendants would polish an otherwise sufficient instruction, the omission of the language does not rise to the level of reversible error.

To further support their position that "actual belief" language should have been included in the deliberate ignorance instruction, the defendants cite *United States v. Kaiser*, 609 F.3d 556 (2d Cir. 2010). In *Kaiser*, the Second Circuit concluded that the "conscious avoidance" instruction given by the lower court was in error because it did not contain "either the 'high probability' or 'actual belief' language that [the court] ha[s] long held is essential for an accurate conscious avoidance instruction." *Id.* at 566. The instruction was also confusing without the "high probability" language. *Id.* As an initial matter, *Kaiser* is not binding on us. Moreover, the district court here included the "high probability" language that was absent in *Kaiser*. Finally, we have not had a long history of emphasizing "actual belief language," nor have we ordered that such holdings be circulated to attorneys to reinforce such a requirement, both of which have occurred in the Second Circuit. *Id.* In short, *Kaiser* is simply unpersuasive and inapplicable to the circumstances in this circuit and this case.

The defendants also imply that the deliberate ignorance instruction may have resulted in liability based on negligent conduct, but such a concern is misplaced. The defendants cite an instruction relating to severe recklessness in this case, not deliberate ignorance. The instruction stated:

> a [d]efendant's claim that he acted in good faith, without more, does
> not preclude you from finding that he acted recklessly.  Therefore,
> even if you find that a [d]efendant believed the representations of
> CyberKey Solutions and James Plant concerning the existence of a
> purchase order from the Department of Homeland Security, you may
> still find the SEC has established that a [d]efendant aided and abetted
> CyberKey Solutions' and James Plant's [fraud] if his belief was based
> upon nothing more than a severely reckless disregard for the truth,
> provided that all of the other elements of the violation have been
> proven.

While such an instruction may be improper as it relates to deliberate ignorance, the

defendants requested that the deliberate ignorance instruction be included in the

instruction explaining the substantive charge.  The district court purposely included

the deliberate ignorance instruction with the severe recklessness instruction so that

the "scienter [was linked] to the correct claim."  Moreover, the court also cautioned

in the same substantive instruction:

> It is not enough to establish severe recklessness to show that the
> [d]efendants acted accidently or made a mistake, nor is it enough to
> show that the [d]efendants were simply negligent or even inexcusably
> negligent.

Both knowledge—proven through establishing deliberate ignorance—and severe

recklessness—through proof of severe, reckless disregard for the truth—satisfied

the scienter requirement.  Thus, the instructions were not misleading simply

because they discussed language related to deliberate ignorance and severe

recklessness—in separate paragraphs—of the same substantive instruction.

Finally, the defendants maintain that the Supreme Court's decision in *Global-Tech*—in which the Court held that a deliberate ignorance (willful blindness) instruction can be applied in civil cases—somehow bolsters their claim that the jury instruction failed to include the subjective component of deliberate ignorance.  131 S. Ct. at 2069 ("[W]e can see no reason why the doctrine [of willful blindness] should not apply in civil lawsuits . . . .").  The Court in *Global-Tech* concluded that the test for deliberate ignorance used by the Federal Circuit departed from the appropriate standard of deliberate ignorance by: (1) permitting a finding of knowledge when there is "merely a 'known risk'" and (2) "demanding only 'deliberate indifference' to that risk."  *Id.* at 2071.  The deliberate ignorance instruction in the instant case contains neither of these phrases, nor any phrases akin to them.  Instead, the deliberate instruction in the instant case included both elements explicitly recognized by the Supreme Court: "(1) the defendant must subjectively believe that there is a *high probability* that a fact exists and (2) the defendant must take *deliberate actions to avoid learning that fact*."  *Id.* at 2070 (emphasis added).  The instant instruction stated in relevant part: "[y]ou may infer knowledge of the existence of a fact if [(1)] a [d]efendant was aware of a *high probability* of the existence of that fact and [(2)] *purposely contrived* t*o avoid learning all the facts*."  (Emphasis added.)  Accordingly, the district court did not err in its instruction to the jury on deliberate ignorance.

#### 4.  Summary Judgment as to § 5(a) and 5(c) of the Securities Act

We review the district court's decision to grant summary judgment *de novo*.

*Ave. CLO Fund, Ltd. v. Bank of Am.*, NA, 723 F.3d 1287, 1293 (11th Cir. 2013).

As a preliminary matter, the defendants contest only the district court's

finding that they had acted as underwriters and dealers with respect to "the

registration requirements of *Section 5*" of the Securities Act.  (Emphasis added.)

Therefore, any claims raised by Big Apple or MJMM as to their § 15(a) violations

of the Exchange Act for failing to register with the SEC are deemed abandoned.

*See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014)

("We have long held that an appellant abandons a claim when he either makes only

passing references to it or raises it in a perfunctory manner without supporting

arguments and authority."); *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324,

1330 (11th Cir. 2004) ("Any issue that an appellant wants [us] to address should be

specifically and clearly identified in the brief . . . .  Otherwise, the issue—even if

properly preserved at trial—will be considered abandoned.").  Regardless, any

argument that can be discerned from the defendants' briefs as to § 15(a) fails as a

matter of law for the same reasons as it fails under § 5.

On summary judgment, the district court found Big Apple, MJMM, and Jablon—the relevant defendants[9] as to this claim—liable for the sale of unregistered shares of CyberKey in violation of § 5(a) and (c) of the Securities Act. Subsections (a) and (c) of § 5 prohibit the "sale" and "offer for sale" of any securities unless a registration statement is in effect or there is an applicable exemption from registration.  15 U.S.C. §§ 77e(a), (c).  "In order to establish a prima facie case for a violation of § 5 of the Securities Act, the SEC must demonstrate that (1) the defendant directly or indirectly sold or offered to sell securities; (2) through the use of interstate transportation or communication and the mails; (3) when no registration statement was in effect."  *SEC v. Calvo*, 378 F.3d 1211, 1214 (11th Cir. 2004).  The defendants do not dispute that the SEC has established a prima facie case for its § 5 claims.

"Once participation in an unregistered sale has been shown, the petitioners have the burden of proving an exemption to the registration requirements." *Zacharias v. SEC*, 569 F.3d 458, 464 (D.C. Cir. 2009) (citing *SEC v. Ralston Purina*, 346 U.S. 119, 126 (1953)).  There are two methods to establish an exemption from the registration requirements of § 5, but only one exemption is at issue in this appeal.  Section 4(1) of the Securities Act exempts "transactions by any person *other than* an issuer, underwriter, or dealer."  15 U.S.C. § 77d(1)

---

[9] Kaley was not a defendant on this claim.  Thus, this section of the opinion referring to "defendants" excludes Kaley.

(emphasis added).  The defendants maintain that they qualify for an exemption under § 4(1).  Although the SEC concedes that Big Apple, MJMM, and Jablon were not issuers, it argues—as the district court found—that the defendants were underwriters and/or dealers.  Therefore, the defendants do not qualify for the relevant exemption.  We agree.

### a. Underwriters

The definition of "underwriter" in the Securities Act "is expansive."  *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1086 (9th Cir. 2010).  An "underwriter" is "any person who has purchased from an issuer with a *view to*, or *offers or sells for* an issuer in connection with, *the distribution* of any security . . . ."  15 U.S.C. § 77b(a)(11) (emphasis added).  In its motion for summary judgment, the SEC argued and the district court found that the relevant defendants were underwriters "because they obtained CyberKey stock *with a view to distribution*."  (Emphasis added.)  Because the burden of proving entitlement to the § 4(1) exemption rests with the defendants, they must at least point to some evidence that their receipt of the unregistered CyberKey shares was *not* made "with a view to" distribution.  *See Ackerberg v. Johnson*, 892 F.2d 1328, 1336 (8th Cir. 1989).

Whether the relevant defendants' receipt of the unregistered shares was made "with a view to" distribution focuses on their investment intent at the time of

acquisition. *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 213 (3d Cir. 2006).

Thus, there is a distinction between acquiring shares from the issuer with an

investment purpose and acquiring shares for the purpose of reselling them.

*Ackerberg*, 892 F.2d at 1336. "Because it is difficult to discern a party's intent at

the time of purchase with respect to downstream sales of unregistered shares,

courts and commentators have typically focused on the amount of time a security

holder holds on to shares prior to reselling them." *Berckeley*, *455 F.3d at 213*; *see*

*also Ackerberg*, 892 F.2d at 1336. Courts have generally agreed that a two-year

holding period is sufficient to negate the inference that the security holder did not

acquire the securities with a "view to distribute." *See Berckeley*, 455 F.3d at 213;

*Ackerberg*, 892 F.2d at 1336; *SEC v. Olins*, No. C-07-6423 MMC, 2010 WL

900518, at *2 (N.D. Cal. Mar. 12, 2010) (citing cases).

Here, defendants claim that they "held onto [CyberKey] stock for months, if

not half a year, maybe even longer." Six months falls well short of the two-year

"rule of thumb" to determine whether the securities were received with a view to

distribution. *Ackerberg*, 892 F.2d at 1336; *see also Berckeley*, 455 F.3d at 213.

The evidence asserted by the SEC paints an even bleaker picture for the

defendants. As the SEC expert explained:

> MJMM had acquired 301.8 million CyberKey [ ] shares as of
> November 9, 2006, and by December 7, 2006, all of these shares were
> sold. On December 7, 2006, MJMM had net sales totaling 304.3
> million shares. By the end of the year, MJMM sold more than 75% of

> the 200 million CyberKey [ ] shares it acquired after June 30, 2006,
> and it sold the remaining shares by January 23, 2007 . . . [O]n
> Decmber 7, 2006, MJMM paid an average price of $0.0152 per share
> to acquire 6.6. million shares of [] stock [by exercising its contractual
> discount] and, on the same day, it was paid an average price of $0.026
> per share to sell 6.0 million shares of [stock].

In *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 467–68 (2d Cir. 1959), the Second

Circuit determined that shares sold more than ten months after being converted

from debentures had not been "held for investment" and thus, were bought "with a

view to distribution."  Similar to the present case, profit was a motivating factor as

to the timing of sale.  *See id.* at 468 ("[T]he intention to retain the debentures only

if Crowell-Collier continued to operate profitably was equivalent to a 'purchase

with a view to distribution.'" (alterations omitted)).

Defendants' citation to the testimony of Maguire, who had authority to trade

stock held by Big Apple and its subsidiaries, is similarly unavailing.  Maguire

testified that "each week [he] had an operational [expense] number" he needed to

match, through stock selling activity, in order to meet Big Apple's operational

needs.  He made "daily decisions  [as to] which stocks to sell," and in selecting

which stocks to sell in a given week, he considered the current price, liquidity,

public information, and at times, purchase price.  Jablon's testimony reveals the

significance of liquidity as a selling factor.  He stated that the decision whether to

hold stock or to sell "[d]epend[ed] on market liquidity," and in the case of

CyberKey, there were instances where the defendants purchased CyberKey stock

"and held onto [the] stock for  months, if not half a year."  But the only reason for

holding the stock as long as six months was because "there wasn't liquidity or

enough liquidity" in the stock, which meant the defendants "would lose money on

[the] investment" if they tried to sell.  Kaley unequivocally acknowledged that

aside from liquidity, "the price [at which the defendants] acquired the shares" was

a "factor taken into consideration."  Sales of stock occurred "[w]hen market

conditions were right"; instructively, if a stock was "acquired at a penny [and

thereafter traded] at half a penny," it would "not be the most opportune time to

sell[.]"  Regardless, the testimony of Maguire, Jablon, and Kaley makes apparent

that the defendants gave no consideration to how long they held the stock or any

other factors that would indicate that they were holding stock for investment

purposes, and, instead, exhibited an overarching concern that they profit from their

selling activity.

Indeed, the defendants' brief itself does not indicate that they were interested

in investment; rather, they claim that they received CyberKey stock with a "more

practical view to being paid for services rendered."  But this does nothing to

bolster their claim that they did not receive stock with an eye to distribution.  Quite

the contrary, at least ninety-five percent of Big Apple's clients paid in stock,

including CyberKey.  It is difficult to fathom how Big Apple could operate by

receiving stock *not* with a "view toward" distribution in order to maintain its own

operating costs.  The defendants also argue that they have submitted evidence that establishes CyberKey had no input into when MJMM or Big Apple sold its shares and that it was not Big Apple's policy to sell stock it received from its customers immediately.  Yet, this also does not negate the overwhelming evidence that the defendants received stock with an view toward distribution.  The definition of an underwriter does not require the immediate distribution of stock received or that the issuer of the stock dictate when the defendants sell the stock; it only requires that the defendants receive the stock with a view to distribution.

While the defendants claim an exemption from registration only under § 4(1) of the Securities Act, they attempt to borrow language and reasoning from the other exemption to § 5 registration requirements.  They claim that Rule 144's safe harbor provision, which is also an exemption to the § 5 registration requirements, only requires a six-month holding period, indicating that the link between the holding time of a security and whether the security was received "with a view to distribution" is tenuous.  17 C.F.R. § 230.144(d).  Further, Rule 144 emphasizes the difficulties associated with ascertaining the mental state of a purchaser of securities.  17 C.F.R. § 230.144.  However, the defendants admittedly do not qualify for the Rule 144 exemption.  Moreover, as the district court reasoned, Rule 144 contains other requirements that safeguard investors, which are not found in

§ 4(1). Accordingly, we decline to extrapolate the changes to Rule 144 to the exemption of § 4.

Simply put, Big Apple, MJMM, and Jablon fail to point to any genuine issues of fact regarding their investment intentions.

### b. Dealers[10]

A "dealer" is "any person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person." 15 U.S.C. §77b(a)(12).[11] We conclude, as the district court found, that Big Apple and MJMM were dealers, and, therefore, they do not qualify for the § 4(1) exemption to securities registration.

To qualify as a "dealer," a person must be in the "business of" buying and selling securities. We think the centerpiece to this definition is the word "business," which is defined as "[a] commercial enterprise carried on *for profit*, a particular occupation or employment habitually engaged in for *livelihood* or *gain*" Black's Law Dictionary 239 (10th ed. 2009) (emphasis added). Central to this

---

[10] It is unclear whether the district court held that only Big Apple and MJMM were dealers or intended to conclude that Jablon was also a dealer. Having already concluded that the district court accurately found Jablon was an underwriter, we will not address whether Jablon was a dealer.

[11] The district court and the parties in this case refer to the definition of dealer under 15 U.S.C. § 78c(a)(5)(A). This likely is because the district court analyzed the definition of dealer as it related to the SEC's § 15(a) claims and generally applied that analysis to the § 5 exception. Because the definition of dealers in 15 U.S.C. § 77b(a)(12) and 15 U.S.C. § 78c(a)(5)(A) are very similar, the district court's analysis was sound.

definition is *profit* or *gain*.  While evidence of merely *some* profits from buying and selling securities may alone be inconclusive proof, the defendants' *entire* business model was predicated on the purchase and sale of securities.  Big Apple and its subsidiaries depended on acquiring client stock and selling that stock to support operations and earn a profit.  In their brief, the defendants do not contest that they received most of their compensation by obtaining and selling their clients' stocks.  Nor could they, as testimony from Maguire, Jablon, and Kaley reveals that the defendants placed a high priority on generating a profit from trades.

As further evidence of their dealer status, Big Apple and MJMM purchased CyberKey stocks at deep discounts pursuant to its contractual agreement with CyberKey and then sold those stocks for profit.  Furthermore, Big Apple and MJMM have not pointed to any evidence to suggest otherwise.   Accordingly, it is indisputable that Big Apple and MJMM were "in the business of . . . buying [and] selling securities . . . issued by" CyberKey and, therefore, they do not meet the § 4(1) exemption to the registration requirement.  15 U.S.C. § 77b(a)(12); 15 U.S.C. § 77d(1).

## 5.  Evidentiary Rulings

We review a district court's evidentiary rulings for an abuse of discretion. *Goodman-Gable-Gould Co. v. Tiara Condo. Ass'n, Inc.*, 595 F.3d 1203, 1210

(11th Cir. 2010).  Our review of the exclusion of expert testimony is "very limited."  *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002).  We will not reverse a jury verdict based on a district court's evidentiary ruling "unless [it] is manifestly erroneous."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997) (internal quotations omitted).

The defendants argue that the district court abused its discretion when it excluded: (1) expert testimony by Stanley Wunderlich (Wunderlich); (2) evidence concerning internal communications at DHS; (3) Youtube video exhibits; (4) the SEC complaint against CyberKey and Plant and their answer to the complaint; and (5) evidence of Keith's health condition.  The defendants also assert that the district court erred when it allowed the SEC to mischaracterize a portion of the SEC expert's opinion during closing argument.

The district court properly excluded the testimony of the defendants' expert witness, Wunderlich.  Wunderlich, a principal in a New York City-based consulting firm, would have opined that investor/public-relations firms customarily rely upon information given to them by their clients and do not customarily seek independent verification of such information.  Wunderlich's opinion suffered several flaws that rendered his testimony inadmissible.  He admitted that he could not actually testify as to an industry practice, but instead could only opine what he would have done based on the facts as he understood them.  His opinion also failed

to consider the important fact that Big Apple and MJMM received client stock as compensation and traded that stock while promoting the client.  His qualifications were also questionable because he did not have a strong connection with the National Investor Relations Institute, whose standards Wunderlich purported to interpret.

Still, even assuming Wunderlich's experience rendered him qualified, we have held that "an expert may be qualified . . . [but that] does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004).  When a witness relies "solely . . . on experience, then [he] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience reliably applied to the facts." *Id.* (quoting Fed. R. Evid. 702) (internal quotation marks omitted).  Wunderlich failed to provide sufficient justification as to how his personal experience could be reliably applied to the facts.  Accordingly, the district court properly performed its "gatekeeping function" by excluding Wunderlich's testimony.  *Id.*

The district court also properly excluded DHS documents that would have shown that DHS experienced difficulties confirming the nonexistence of CyberKey's fictitious DHS contract.  The district court concluded that since the

49

defendants did not attempt to contact DHS, any evidence concerning what the DHS

knew was irrelevant.  We agree.  The issues at trial related to whether the

defendants knew that CyberKey did not have a contract with DHS.  The fact that

DHS may have experienced difficulties confirming the non-validity of the DHS

contract does not make it "less probable" that the defendants knew that the DHS

contract was fabricated.  Fed. R. Evid. 401.  Such evidence would only be relevant

if the defendants knew or attempted to discover what DHS knew.

The defendants next claim that the court erred by excluding YouTube videos

that they believe demonstrated Plant's persuasiveness.  Prior to trial, the SEC

objected to the admissibility of the videos on three grounds: (1) the defendants had

failed to comply with the Fed. R. Civ. P. 26 disclosure requirements, and therefore,

the evidence should be excluded pursuant to Fed. R. Civ. P. 37; (2) the videos were

irrelevant; and (3) the videos had not been authenticated.  The court found that

while the defendants had failed to comply with the disclosure requirements, the

late disclosure could be cured because the trial had been delayed.  Therefore, the

court agreed to admit the evidence so long as the videos were relevant and

authenticated.  The court concluded that only one of the videos was relevant.  In

the admissible video, Plant discussed the development of CyberKey's products for

government use and alluded to a contract with DHS.  However, the other videos

contained only general information about CyberKey and Big Apple and were

therefore irrelevant to the issues at trial.  The court concluded that as to the admissible video, the SEC would be allowed to conduct any necessary discovery and would be awarded reasonable fees and costs related to such discovery due to the defendants' late disclosure.

The district court did not abuse its discretion by excluding all but one of the proposed videos as irrelevant and by admitting one of the videos so long as the defendants allowed the SEC to pursue discovery.  As an initial matter, the defendants do not provide a detailed description of the excluded videos.  The defendants also *chose* not to introduce the video that the court ruled was admissible because of the costs associated with allowing the SEC to pursue discovery related to the video.  The defendants' primary argument is that the videos would have shown how persuasive Plant was and would have lent credence to the defendants' theory that they were simply "dupe[d]" by Plant's scheme.  However, that the defendants *chose* not to introduce the one video the district court deemed relevant to such an argument is of no concern to us.  The exclusion of the remainder of the videos was well within the discretion of the district court.  For example, it was undisputed that Big Apple appeared to be an otherwise legitimate business, and, therefore, the district court did not err by excluding a video of a Big Apple advertisement as irrelevant.  *See* Fed. R. Evid. 401.

While the defendants baldly state that the district court erred by excluding the SEC complaint against Plant and CyberKey, their answer to that complaint, and evidence of Keith's health condition, they failed to flesh out such arguments, except by referring to them in a footnote.  "We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."  *Sapuppo*, 739 F.3d at 681.  The defendants' fleeting footnote explaining in one sentence that such evidence "could be relevant" is insufficient to properly assert a claim on appeal.

Finally, the defendants contend that the district court improperly permitted the SEC to mischaracterize testimony by the SEC's expert witness.  Because the defendants did not object to the SEC's statements during closing argument, we review for plain error.  *United States v. Edouard*, 485 F.3d 1324, 1343 (11th Cir. 2007).

Prior to trial, the district court found that the one of the proposed opinions of the SEC's expert, Robert Lowry, was a legal conclusion.  Lowry sought to opine that a broker-dealer is required to investigate red flags relating to information reported to them from their clients.  During trial, Lowry opined, without objection, that under the standard practice, "[i]t is not reasonable [for a broker-dealer] to rely solely on the information provided by the [client] company."  During closing argument, the SEC referred to Lowry's testimony, again without objection.  The

SEC's closing argument clearly referred to Lowry's opinion about the *standard of practice* a broker-dealer should meet, not an improper legal conclusion.  Moreover, "we presume that the jurors followed the court's instructions," which provided the law in this case.  *Brown v. Jones*, 255 F.3d 1273, 1280 (11th Cir. 2001).  Accordingly, we find no plain error.

Separately, Kaley argues that the district court improperly permitted Lowry to testify that Kaley's conduct was "not reasonable."  Specifically, Kaley claims that Lowry's testimony that Kaley did not act reasonably is a "legal conclusion" that implies Kaley could be found liable for merely acting negligently.  As Kaley did not object or request a limiting instruction, we again review for plain error.  *Sapuppo*, 739 F.3d at 681.  As already indicated, Lowry did not testify that the defendants acted with any particular mental state, but rather, he opined that the defendants failed to conduct reasonable due diligence under industry standards.  This does not amount to a legal conclusion, and there was no error.

## 6. Sufficiency of the Evidence as to Kaley

Finally, Kaley, proceeding *pro se*, claims that the district court erred when it denied his motion for judgment as a matter of law.  Kaley insists that there was insufficient evidence for the jury to find that he acted knowingly and recklessly in violation of § 17(a)(1) of the Securities Act and § 20(e) of the Exchange Act.  We disagree.

Shortly after the trial concluded, Kaley's counsel withdrew from representing him.  Kaley subsequently filed a "pro se motion for directed verdict and judgment as a matter of law."  His arguments primarily focused on the sufficiency of the evidence relating to the scienter requirements of both statutes.  His motion was non-compliant with the district court's order, which had instructed that the defendants' motion for judgment as a matter of law be limited to the issue of the deliberate ignorance instruction.  The district court nevertheless concluded that "there was more than enough evidence for a reasonable jury to at least infer actual knowledge . . . based on deliberate ignorance."  While it is unclear whether Kaley's argument was properly preserved, we will likewise address his sufficiency of the evidence argument.

However, to the extent Kaley challenges the sufficiency of the evidence to support his participation in the fraudulent scheme or other elements of the claims against him, such claims are not preserved for our review.  "A Rule 50(b) motion is a renewal of a Rule 50(a) motion.  This Court repeatedly has made clear that any renewal of a motion for judgment as a matter of law under Rule 50(b) must be based upon the same grounds as the original request for judgment as a matter of law made under Rule 50(a) at the close of the evidence and prior to the case being submitted to the jury."  *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 903 (11th Cir. 2004) (citation omitted).  During trial, Kaley, through his counsel, only moved for

a Rule 50(a) judgment as a matter of law on the basis of the insufficient evidence to prove the defendants' scienter, not based on the sufficiency of evidence relating to other elements of the claim.  In order to ensure that opposing counsel is not "ambushed" by a sufficiency of the evidence argument, a party may renew its Rule 50(a) motion after trial "under Rule 50(b), but a party cannot assert grounds in the renewed motion that it did not raise in the earlier motion." *Celebrity Cruises*, 394 F.3d at 903 (internal quotation marks omitted).  Accordingly, to the extent Kaley now attempts to challenge the sufficiency of the evidence to support his participation in the fraudulent scheme, such an argument is not preserved for our review.[12]

"We review *de novo* the district court's rulings on motions under Rule 50 of the Federal Rules of Civil Procedure, examining the trial evidence in the light most favorable to the non-moving party." *Celebrity Cruises*, 394 F.3d at 902.

Sufficient evidence supported the jury's determination that Kaley acted with actual knowledge and severe recklessness in violation of §17(a)(1) of the Securities Act and § 20(e) of the Exchange Act.  In his brief, Kaley maintains that the SEC's stipulation that Plant "concocted his scheme with an intent to deceive . . . precludes an inconsistent and contrary position that Kaley violated § 17(a) or § 20(e)."  But just because Plant intended to deceive the defendants does not mean they were

---

[12] The district court also did not address any other sufficiency of the evidence claims in its post-trial order addressing the defendants' Rule 50(b) motions.

actually deceived.  That Kaley also acted with deliberate ignorance of the truth and/or severe recklessness is not "contrary" to Plant's intentional fraud.

Moreover, Kaley equates circumstantial evidence with no evidence.  He further fails to recognize that we must view the evidence in the light most favorable to the SEC, as it is the non-moving party.  *Celebrity Cruises*, 394 F.3d at 902.  For example, Kaley argues that Plant's repeated last-minute re-scheduling of meetings with potential buyers is consistent with CyberKey being a small company entering the market.  While this may be one way of viewing the evidence, Plant's repeated last-minute cancellation of meetings could also corroborate the SEC's theory that Kaley and the other defendants repeatedly turned a blind eye to the red flags of fraud in an effort to profit from the acquisition and sale of CyberKey stock.  Kaley also maintains that the internal inconsistencies in the DHS contract were not obvious and were only obvious to the SEC expert who was "playing Monday morning quarterback."  Again, the jury was capable of viewing the DHS contract and determining whether the inconsistencies were indeed obvious.  The jury was likewise able to listen to the SEC expert to determine whether he was merely testifying with the benefit of hindsight or whether such inconsistencies should have been apparent to the defendants.

Kaley also argues there was no evidence that he doubted Plant's honesty and reliability and maintains it was clear error for the district court to rely on the

"broken promises" memorandum drafted by Keith as evidence of Kaley's scienter.

Kaley complains he only saw the broken promises memorandum after it was

drafted and that the memorandum did not include any evidence of his subjective or

objective beliefs about Plant's honesty.   Again, Jablon emailed Kaley the broken

promises memorandum in the summer of 2006, but Kaley did nothing to

investigate whether Plant and CyberKey were committing fraud.   The jury could

infer that Kaley viewed the broken promises memorandum and turned a blind eye

to Plant's fraud or, at least, that Kaley was severely reckless.   While Kaley

understandably views the evidence in the light most favorable to himself, the jury

was free to do otherwise.   Accordingly, there was sufficient evidence of Kaley's

scienter for the jury to find him liable under § 20(e) and § 17(a)(1).

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

Douglas J. Mincher
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

April 09, 2015

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  13-11976-AA
Case Style:  Securities and Exchange Commis v. Mark Kaley
District Court Docket No:  6:09-cv-01963-JA-GJK

**This Court requires all counsel to file documents electronically using the Electronic Case Files
("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today
in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at
a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a
petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP
25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the
clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1.
The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by
11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a
complete list of all persons and entities listed on all certificates previously filed by any party in the
appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included
in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the CRIMINAL JUSTICE ACT must file a CJA voucher claiming
compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing
with the U.S. Supreme Court of a petition for a writ of certiorari (whichever is later).

For questions concerning the issuance of the decision of this court, please call the number referenced in
the signature block below. For all other questions, please call David L. Thomas, AA at (404) 335-6169.

Sincerely,

DOUGLAS J. MINCHER, Clerk of Court

Reply to: Djuanna Clark
Phone #: 404-335-6161

OPIN-1 Ntc of Issuance of Opinion